UNITED STATES, BY McREYNOLDS, ATTORNEY GENERAL, v. LOUISVILLE & NASHVILLE RAILROAD COMPANY.

ERROR TO AND APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY.

No. 499.	Argued January 5, 6, 1915.—Decided February 23, 1915.

No authority beyond that already conferred on the Interstate Commerce Commission by the Act to Regulate Commerce can be derived by that Commission from a resolution passed by only one branch of Congress; and so *held* that the powers of the Commission in making the investigation required by Senate Resolution No. 153, in regard to inspection of accounts and other papers, are limited to those conferred by the Act to Regulate Commerce and the amendments thereto.

Section 12 of the Act to Regulate Commerce does not make provision for inspection of accounts and correspondence of carriers authorized by the Commission; that feature was added by the Hepburn Act of June 29, 1906, amending § 20 of the Commerce Act.

The Hepburn Act, like other statutes, may be read in the light of the purpose it was intended to subserve, and the history of its origin and the report of the Interstate Commerce Commission submitted to Congress recommending the passage of the Act may be referred to.

As construed in the light of such report, and applying the rule of *noscitur a sociis*, § 20 of the Act to Regulate Commerce does not provide for the compulsory inspection of the correspondence of carriers, but is limited to accounts, including records, documents and memoranda.

Congress is not likely to enact a sweeping provision subjecting all correspondence of carriers to examination, attended with serious consequences in cases of withholding it, without using language adequate to that purpose.

The protection of confidential communications between attorney and client is well known and recognized as a matter of public policy.

The right of inspection of whatever accounts, records, documents and memoranda are included within § 20 of the Act to Regulate Commerce, as amended by the Hepburn Act, is not limited to those kept and made after the passage of the latter Act, but includes those kept and made prior thereto.

UNITED STATES *v.* LOUIS. & NASH. R. R. 319

236 U. S. Argument for United States and Interstate Com. Comm.

*Quære,* whether compulsory inspection of correspondence and other matters referred to in Senate Resolution No. 153 of Nov. 6, 1913, can be permitted within the constitutional rights of the carrier.

Where the Interstate Commerce Commission has applied for a writ of mandamus broader than the law permits, and no amendment was made narrowing the demand, but the petition was dismissed without prejudice, the proper practice is to affirm the order and not to reverse so as to grant the relief within the limits which the law allows; a new proceeding may be started for that purpose.

212 Fed. Rep. 486, affirmed.

THE facts, which involve the power of the Federal court to require the production of testimony, books and papers by a carrier under the provisions of the Anti-Trust Act in a proceeding started by the Interstate Commerce Commission pursuant to a resolution of the Senate of the United States, are stated in the opinion.

*The Solicitor General,* with whom *Mr. Theodor Megaarden* was on the brief, for the United States, and *Mr. Joseph W. Folk* for the Interstate Commerce Commission:

The scope and purpose of the pending investigation is within the purview of the Commerce Act and within the power and jurisdiction of the Commission.

Information of the relations existing between carriers is indispensable and necessary for the performance by the Commission of its proper duties.

The preservation of competition is one of the purposes of the Act, and its existence or non-existence bears directly upon the questions of discrimination, reasonableness of rates, and similar matters. *Gerke Brewing Co.* v. *Louis. & Nash. R. R.,* 5 I. C. C. 596, 606; *Int. Com. Comm.* v. *Balt. & Ohio R. R.,* 145 U. S. 263, 276.

It is also important to ascertain whether charges fixed by a carrier are just and reasonable within § 1 of the Act. *Int. Com. Comm.* v. *Chi. Gr. West. Ry.,* 209 U. S. 108, 119.

The matter of competition is also to be considered in applying the provisions of §§ 3 and 4 with reference to

undue or unreasonable preference to persons, etc., and the long and short haul clause. *Int. Com. Comm.* v. *Alabama Midland Ry.*, 168 U. S. 144, 164.

The subject is likewise material in connection with § 5 (pooling section) of the Act. *Central Yellow Pine Ass'n* v. *Ill. Cent. R. R.*, 10 I. C. C. 505; *East Tenn. &c. Ry.* v. *Int. Com. Comm.*, 99 Fed. Rep. 52, 61.

Whether a carrier is subject to the Act at all frequently depends upon the relation between it and other carriers. *Cincinnati &c. Ry.* v. *Int. Com. Comm.*, 162 U. S. 184.

The inquiry of the Commission is proper as a basis for legislative recommendations, for legal prosecutions, and for many other purposes. *Int. Com. Comm.* v. *Brimson*, 154 U. S. 447, 474; *Int. Com. Comm.* v. *Goodrich Transit Co.*, 224 U. S. 194, 208.

The inquisitorial work of the Commission has been the basis of practically all congressional legislation affecting interstate carriers during the past 25 years. Where the persons and subjects under consideration are within the field of the Commission's lawful activities, the courts will not inquire as to the ultimate object of the investigation.

As to the plenary power of the Commission see *Int. Com. Comm.* v. *Brimson, supra.; Int. Com. Comm.* v. *Goodrich Transit Co., supra.; Tex. & Pac. Ry.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 438.

Even if the investigation should divulge violations of the Anti-Trust Act rather than of the Act to Regulate Commerce, that would not end the Commission's power. *Int. Com. Comm.* v. *Louis. & Nash. R. R.*, 227 U. S. 88, 93.

In the course of this investigation the Commission was entitled to inspect the accounts, records, and memoranda, including correspondence, of the carrier and no peculiar privilege attends the so-called private and confidential correspondence between its officers and agents. *Grant* v. *United States*, 227 U. S. 74; *Wheeler* v. *United States*, 226 U. S. 478; *Wilson* v. *United States*, 221 U. S.

UNITED STATES *v.* LOUIS. & NASH. R. R.   321

236 U. S.   Argument for United States and Interstate Com. Comm.

361. This is shown by the fact (otherwise unnecessary) that Congress makes it an offense for an examiner to divulge any information which may come to him during the course of an examination.

The privilege asserted as to the correspondence between the carrier and its attorneys is no warrant for refusing the writ as to other documents. The proposed examination is not an unreasonable search and seizure, nor does it violate any constitutional right of the carrier.

A corporation is not entitled to plead the immunity of the Fifth Amendment, and it is doubtful whether it can plead the immunity of the Fourth Amendment. *Hale* v. *Henkel,* 201 U. S. 43, 74; *Int. Com. Comm.* v. *Baird,* 194 U. S. 25. A corporation cannot restrict the production of its books and papers on the ground of self-crimination. *Wilson* v. *United States,* 221 U. S. 361, 382.

While an order calling for the production of such a large part of the records of a corporation that their absence will put a stop to the business of the company may constitute an unreasonable search and seizure, *Hale* v. *Henkel, supra,* this has no application to the case at bar, since the Commission seeks only to inspect the records of the defendant in error.

Having the power to regulate, Congress must also be held to have the power to determine what means are appropriate for carrying into effect its control. *Flint* v. *Stone-Tracy Co.,* 220 U. S. 107, 176.

The right to inspect accounts, records, and memoranda, including correspondence, is not limited to those only which have come into being since August 28, 1906, but extends to all those in the possession of the carrier whenever created. This does not make the Act retrospective in a legal sense. *Society* v. *Wheeler,* 2 Gall. 104; *Sturges* v. *Carter,* 114 U. S. 511.

The intent of the Act is to afford access to preexisting documents. Even if, when so construed, it can properly

be called retrospective, it is none the less within the power of Congress.

There are no constitutional restrictions upon Congress in the matter of retrospective legislation as there are in some of the States. *Satterlee* v. *Matthewson*, 2 Pet. 380; *Sinking-Fund Cases*, 99 U. S. 700.

The main purpose of the Hepburn Act was to provide more adequate means for the enforcement of rights and duties declared to exist, and the Act impairs no existing rights or obligations, but, on the contrary, is a means of their effective enforcement.

*Mr. Helm Bruce,* with whom *Mr. Henry L. Stone, Mr. William A. Colston* and *Mr. Edward S. Jouett* were on the brief, for defendant in error and appellee:

The inquiry directed by the Commission was limited by its terms; and the examiners had no right to go beyond those limits.

The Commission had no authority to make the examination it sought to make. *Traders' Union* v. *Philadelphia R. R.*, 1 I. C. C. 374; *New York Produce Exch.* v. *Balt. & Ohio R. R.*, 7 I. C. C. 658; *Sprigg* v. *Balt. & Ohio R. R.*, 8 I. C. C. 456; *Haines* v. *Chi. & Rock Isl. R. R.*, 13 I. C. C. 214; *Tex. & Pac. Ry.* v. *Int. Com. Comm.*, 162 U. S. 216, 221; *United States* v. *Pacific & Arctic Co.*, 228 U. S. 87; *Harriman* v. *Int Com. Comm.*, 211 U. S. 418.

There are differences in the purposes of the Act to Regulate Commerce and the Anti-Trust Act. *Cin., N. O. & T. P. R. R.* v. *Int. Com. Comm.*, 162 U. S. 197; *No. Sec. Co.* v. *United States*, 193 U. S. 331; *United States* v. *Freight Ass'n*, 166 U. S. 315; *United States* v. *Joint Traffic Ass'n*, 171 U. S. 565.

The inquiry sought to be made by the Commission concerned conditions regulated by the Sherman Anti-Trust Act, but not by the Interstate Commerce Act.

The Commission's inquisitorial powers are not without limit. *Int. Com. Comm.* v. *Brimson,* 154 U. S. 447, 473.

Section 20 as amended by the Hepburn Act does not give the Commission access to the correspondence of the carrier. *Connecticut Life Ins. Co.* v. *Schaefer,* 94 U. S. 459; *Blackburn* v. *Crawfords,* 3 Wall. 175; 4 Wigmore on Evid., § 2290, p. 3193.

The rule of *noscitur a sociis* applies to the construction of this statute. *Virginia* v. *Tennessee,* 148 U. S. 503.

Penal statutes should be strictly construed. *United States* v. *Wiltberger,* 5 Wheat. 96.

Statutes should be construed, if possible, to avoid reasonable doubts as to constitutionality. *Harriman* v. *Int. Com. Comm.,* 211 U. S. 422.

The Hepburn Amendment to § 20 of the Commerce Act does not give the Commission access to records existing prior to the passage of that Act.

The search of defendant's papers sought by the Commission's examiners would, if permitted, be an unreasonable search, contrary to the Federal Constitution; to the protection of which amendment corporations are entitled. *Hale* v. *Henkel,* 201 U. S. 43, 75; *In re Pacific Ry. Comm.,* 32 Fed. Rep. 241, 263.

MR. JUSTICE DAY delivered the opinion of the court.

This is an appeal from and writ of error to the District Court of the United States for the Western District of Kentucky, refusing a writ of mandamus which the United States undertook to obtain under authority of § 20 of the Act to Regulate Commerce, as amended, June 29, 1906, c. 3591, 34 Stat. 584, 594, 595. In view of the character of an action in mandamus we are of opinion that the review is by writ of error. *Ins. Co.* v. *Wheelwright,* 7 Wheat. 534; *Commonwealth of Kentucky* v. *Dennison,* 24 How. 66, 97;

High on Extraordinary Legal Remedies, §§ 6, 557. The appeal is therefore dismissed.

The petition sets forth the authority conferred upon the Commission by § 20 of the Act, and also § 12, and embodies a copy of a resolution passed by the Senate of the United States which is given in the margin.[1]  It further

---

[1] "RESOLUTION.

"Resolved, That the Interstate Commerce Commission be, and the same is hereby, directed to investigate, taking proof and employing counsel if necessary, and report to the Senate as soon as practicable—

"First. What amount of stock, bonds, and other securities of the Nashville, Chattanooga and Saint Louis Railway is owned or controlled by the Louisville and Nashville Railroad;

"Second. What other railroad or railroads in the territory served by the Louisville and Nashville Railroad and the Nashville, Chattanooga and Saint Louis Railway have been purchased, leased, controlled, or arrangements entered into with, for the purpose of controlling by either the Louisville and Nashville Railroad or the Nashville, Chattanooga & Saint Louis Railway;

"Third. Whether the Louisville and Nashville Railroad and the Nashville, Chattanooga and Saint Louis Railway serve the same territory in whole or in part, and whether, under separate ownership, they would be competitive to the various points in their territories;

"Fourth. Any other fact or facts showing or tending to show the further relations between the Louisville and Nashville Railroad and the Nashville, Chattanooga and Saint Louis Railway, and any fact or facts showing or tending to show whether these relations restrict competition and maintain fixed rates;

"Fifth. The terms of the lease of the Nashville and Decatur Railroad by the Louisville and Nashville Railroad, and what amount, if any, of stock, bonds, and other securities of the Nashville and Decatur Railroad, and of the Lewisburg and Northern Railroad are owned by the Louisville and Nashville Railroad, or any of its subsidiaries, or holding companies;

"Sixth. Whether the Nashville and Decatur Railroad, the Lewisburg and Northern Railroad, and the Louisville and Nashville Railroad serve the same territory, in whole or in part, and whether, under separate ownership, these railroads would be competitive between various points in their territories;

"Seventh. Any other fact or facts showing or tending to show, the

states that for the purpose of enabling the Commission to
perform its duties, it appointed two special agents and
duly authorized them to inspect and examine the accounts,
records and memoranda of the defendant Railway Com-
pany; that on February 4, 1914, one of said agents de-
manded of the Vice President of the defendant, the officer

---

further relations between the Louisville and Nashville Railroad, the
Nashville and Decatur Railroad, and the Lewisburg and Northern
Railroad, and any fact or facts showing, or tending to show, whether
these relations restrict competition and maintain and fix rates;

"Eighth. Any fact or facts showing, or tending to show (a) the rela-
tions between the Louisville and Nashville Railroad, the Nashville,
Chattanooga and Saint Louis Railway, the Tennessee Midland Rail-
road, the Tennessee, Paducah and Alabama Railroad, and any other
railroads that have been purchased or leased by either or both of said
railroad companies, and whether such relations restrict competition
and maintain and fix rates; and, (b) whether the lease of the Western
and Atlantic Railroad by the Nashville, Chattanooga and Saint Louis
Railway from the State of Georgia, and the arrangement made between
the Louisville and Nashville and the Nashville, Chattanooga, and Saint
Louis Railway by which the former uses the tracks of the said Western
and Atlantic Railway restrict competition, restrain trade, and deter-
mine and fix rates;

"Ninth. Any fact or facts showing, or tending to show, whether the
ownership of the Louisville and Nashville Railroad and the Nashville,
Chattanooga and Saint Louis Railway of any railroad terminals or
terminal companies, steamboats and steamboat lines upon the Cumber-
land and Tennessee Rivers, and any dock or dock yards at Pensacola,
New Orleans, Mobile, or other seaport establishes a monopoly and re-
stricts competition and determines and fixes rates;

"Tenth. Any fact or facts showing, or tending to show, whether an
agreement or arrangement has been entered into between the Louisville
and Nashville and other railroad companies for the purpose of prevent-
ing competition from entering into any of the territory served by the
Louisville and Nashville Railroad, in consideration of the Louisville
and Nashville Railroad agreeing not to enter into certain other terri-
tory, or in consideration of any other agreement or arrangement;

"Eleventh. What amount of stock, if any, the Atlantic Coast Line
Company or Atlantic Coast Holding Company owns in the Louisville
and Nashville Railroad, and in the Atlantic Coast Line, and whether

in charge and control of the accounts, records and mem-
oranda of the Company, and to and of other officers, access
to and opportunity to examine the accounts, records and
memoranda kept by the defendant prior to August 28,
1906, [The Hepburn Act took effect August 29, 1906] and
that the same was refused by the officers of the Company;
that on February 4, 1914, a demand was made for an op-
portunity to examine the accounts, records and mem-
oranda of the defendant on and subsequent to August 28,
1906, which was refused; and a writ of mandamus was
asked against the company, requiring it to give access to
its accounts, records and memoranda, and its correspond-
ence and copies of correspondence, and indexes thereto,
and to afford opportunity to examine the same to the Com-
mission and its agents and examiners, and to give such
access to and opportunity to examine the said accounts,
records and memoranda made and kept by and for said

the ownership by such holding company of a majority of stock in both
of the aforesaid railroads tends to restrict competition and maintain
and fix rates;

"Twelfth. What amount, if any, the Louisville and Nashville Rail-
road, the Nashville, Chattanooga and Saint Louis Railway, the Nash-
ville and Decatur Railroad, and the Lewisburg and Northern Railroad,
all or any of them, have subscribed, expended or contributed for the
purpose of preventing other railroads from entering any of the territory
served by any of these railroads for maintaining political or legislative
agents, for contributing to political campaigns, for creating sentiment
in favor of any of the plans of any of said railroads; and,

"Thirteenth. (a) The number of free annual passes; (b) the number
of free-trip passes; (c) the number of every kind of free passes issued by
each of said railroads each year since January first, nineteen hundred
and eleven, to members of legislative bodies and other public officials,
or at the request of members of legislative bodies and other public
officials; (d) the total mileage traveled upon free passes issued under
each of the above classifications; and (e) the amount in money the free
passes issued under each of the above-mentioned classifications would
equal at the regular rates for such service of each of the above-named
railroads."

defendant both before, on, and subsequent to August 28, 1906, including correspondence, copies of correspondence, and indexes thereto, and other indexes to said accounts, records, and memoranda.

To this petition the defendant answered, setting out that it did, prior to the beginning of the suit, give the examiners access to the correspondence other than privileged communications, and that after this suit it did refuse and does now refuse to give to said Commission or to said agent access to or opportunity to examine correspondence received by it before, on, or subsequent to August 28, 1906, or copies of correspondence sent out by defendant before, on or subsequent to that date, or the indexes kept with respect to said outgoing and incoming correspondence by defendant (except correspondence as to passes issued since January 1, 1911), and the defendant set up that its correspondence contains private communications between its various officers and agents regarding various matters which did not in any way pertain to the provisions of the Act to Regulate Commerce, nor to any act of Congress, the provisions of which it is made the duty of the Interstate Commerce Commission to enforce, and avers that said correspondence contains communications of a private and confidential nature between the president of the railway company and the heads of the various departments, relative to its internal affairs, to its proposed constructions and extensions in the future, to its policies with competing and rival roads, to its relations with labor organizations represented in its operating department, and to a variety of other subjects of a private and confidential nature, and that do not relate to the provisions of the Act to Regulate Commerce and acts amendatory thereto, or to any other act of Congress as to the enforcement of which any duty has been imposed upon the Interstate Commerce Commission, and that said correspondence also contains confidential, private, and privileged communications be-

tween defendant and its attorneys. The answer further
sets up that under the provisions of § 20 of the Commerce
Act a uniform system of accounting has been prescribed
by the Commission, and that defendant has fully complied
with all such requirements, and that the Commission's
examiners have full and complete access to the same; that
if the Act to Regulate Commerce can be construed as giv-
ing the said Commission or its examiners a right of access
to, and the right to examine or inspect at will, any or all ac-
counts, records, and memoranda, and all correspondence
received, and all copies of correspondence sent out by the
defendant or its officials in the manner and as set out and
claimed in the petition, then the exercise of such alleged
right in this respect will amount to and operate as an
unreasonable search and seizure of the private papers of
the defendant, in violation of the Fourth Amendment to
the Constitution of the United States.

The answer further sets out a copy of the Senate Resolu-
tion, and the order of the Interstate Commerce Commis-
sion ordering the investigation and inquiry concerning the
matters and things set forth in the resolution, and provid-
ing that the proceeding be set for hearing at such times and
places, and that such persons be required to appear and
testify, or to produce books, documents and papers, as
the Commission may direct, and that a copy be served
upon certain railways, including the defendant. The an-
swer also sets up that the subject-matter of the first twelve
paragraphs of the Senate Resolution was not within the
authority of the Interstate Commerce Commission, and
avers that as to the subject-matter of the thirteenth para-
graph, which relates to free passes, since January 1, 1911,
defendant permitted the Commission and its examiners
and agents, on their request, to have access to and to
examine and inspect all accounts, records and memoranda,
relating to such passes, whether interstate or intrastate,
and also all correspondence relating to such passes (al-

though defendant claims that the Commission had no legal right to examine any of said correspondence, nor to examine any intrastate passes, or any accounts, records, and memoranda pertaining thereto).

Motion was made for the writ of mandamus to issue as prayed for in the petition, certain testimony was taken, showing the demand of the agent and the refusal of the Company. Upon hearing the motion was denied.

The testimony shows that the refusal withheld from the inspection of the agents making the demand all accounts, records and memoranda kept prior to August 28, 1906; all accounts, records and memoranda subsequent to that date except such as to which the form had been subsequently prescribed by the Commission; all correspondence and the indexes thereto upon any subject other than the issue of passes subsequent to January 1, 1911, and all certificates of destruction, if any, relating to papers antedating August 28, 1906.

The discussion in this case has taken a wide range, and much has been said of the constitutional rights of the defendant and the authority of the Commission to carry out the purpose of the Interstate Commerce Act, and to make investigations which shall be the basis of the discharge of duties imposed upon it by the law. But, as we view the case, the real questions may be determined by a consideration of certain provisions of the Act to Regulate Commerce. We may at the beginning put aside any question of authority derivable from the resolution passed by the Senate. The resolution was passed by only one branch of the legislative body and it is not contended by the Government or the Commission that any authority is derivable from it.

To authorize the Government to demand the writ of mandamus in this case two sections of the Interstate Commerce Act are invoked,—twelve and twenty. It is enough to say of § 12 that the record discloses that the proceedings

and the demands for inspection in this case were not conducted under its authority. See *Harriman Case*, 211 U. S. 407.

Section 12 deals with the production of evidence in certain cases; it does not make provision for inspection by examiners duly authorized by the Commission. That feature of the law was added by the amendment to § 20, of June 29, 1906.

The substantial question in the case is: Was the right of inspection of the accounts, records and memoranda of the defendant in the manner attempted by the agents who represented the Commission in this respect, authorized by § 20 of the Act, as the same is amended by the Hepburn Act of June, 1906?

That section as amended provides in part:

"The Commission may, in its discretion, prescribe the forms 'of any and all accounts, records, and memoranda to be kept by carriers subject to the provisions of this act, including the accounts, records, and memoranda of the movement of traffic as well as the receipts and expenditures of moneys. The Commission shall at all times have access to all accounts, records, and memoranda kept by carriers subject to this act, and it shall be unlawful for such carriers to keep any other accounts, records, or memoranda than those prescribed or approved by the Commission, and it may employ special agents or examiners, who shall have authority under the order of the Commission to inspect and examine any and all accounts, records, and memoranda kept by such carriers. This provision shall apply to receivers of carriers and operating trustees.

"In case of failure or refusal on the part of any such carrier, receiver, or trustee to keep such accounts, records, and memoranda on the books and in the manner prescribed by the Commission, or to submit such accounts, records, and memoranda as are kept to the inspection of the Commission or any of its authorized agents or examiners, such

carrier, receiver, or trustee shall forfeit to the United States the sum of five hundred dollars for each such offense and for each and every day of the continuance of such offense, such forfeitures to be recoverable in the same manner as other forfeitures provided for in this act.

"Any person who shall willfully make any false entry in the accounts of any book of accounts or in any record or memoranda kept by a carrier, or who shall willfully destroy, mutilate, alter, or by any other means or device falsify the record of any such account, record, or memoranda, or who shall willfully neglect or fail to make full, true, and correct entries in such accounts, records, or memoranda of all facts and transactions appertaining to the carrier's business, or shall keep any other accounts, records, or memoranda than those prescribed or approved by the Commission, shall be deemed guilty of a misdemeanor and shall be subject, upon conviction in any court of the United States of competent jurisdiction, to a fine of not less than one thousand dollars nor more than five thousand dollars, or imprisonment for a term not less than one year nor more than three years, or both such fine and imprisonment.

"Any examiner who divulges any fact or information which may come to his knowledge during the course of such examination, except in so far as he may be directed by the Commission or by a court or judge thereof, shall be subject, upon conviction in any court of the United States of competent jurisdiction, to a fine of not more than five thousand dollars or imprisonment for a term not exceeding two years, or both."

This section, it will be observed, gives authority to the Commission to employ special agents or examiners, who shall have authority under the order of the Commission to inspect and examine any and all accounts, records and memoranda kept by such carriers. The copy of the authority issued by the Commission to the special agent or

examiner who made the demand for inspection in this case
shows that he was clothed with authority to examine any
and all "accounts, records and memoranda" kept by
carriers subject to the Act to Regulate Commerce. The
language here used, taken from § 20, shows that the Com-
mission acted under authority of that section, and the
examiner was thereby authorized to make the demand,
the refusal to comply with which was the basis for the
petition for the writ of mandamus in this case.

This part of the amended section, as the report of the
Interstate Commerce Commission, 1905, page 11 shows,
was framed by the Commission and became a part of the
law upon its recommendation. The appendix to the report
(p. 182) shows the amendment in the form in which it
became a law. In commending the passage of such an
act, the Commission, in its report to Congress, said:

"Examination of Books of Account."

"An efficient means of discovering illegal practices
would be found, as we believe, in authority to prescribe
a form in which books of account shall be kept by railways,
with the right on the part of the Commission to examine
such books at any and all times through expert account-
ants. This recommendation has been urged upon the
attention of the Congress in previous reports, and we
earnestly renew it at this time. Probably no one thing
would go further than this toward the detection and pun-
ishment of rebates and kindred wrongdoing.

"We have also called attention to the fact that certain
carriers now refuse to make the statistical returns required
by the Commission. For example, railways are required,
among other things, to indicate what permanent improve-
ments have been charged to operating expenses. Without
an answer to this question, it is impossible to determine to
what extent gross earnings have been used in improving
the property and the actual cost of operation proper.

Admitting the right of a railroad company to use its money as it sees fit, it is certainly proper that the government should know what use is made of it, for the purpose of determining whether its rates and charges imposed are legitimate. Certain important railways decline to furnish this information at all and others furnish it in a very imperfect and unsatisfactory manner.

"We have also recently required carriers to furnish statistics showing the rate per ton-mile actually received for the movement of certain kinds of carload traffic, but this requirement has not been generally complied with."

Responding to this recommendation, and acting upon the bill in the form proposed by the Commission, it was adopted as an amendment and became Amended § 20 of the Act to Regulate Commerce.

Of course this Act, like other acts, may be read in the light of the purpose it was intended to subserve and the history of its origin. We find then that in this section Congress has authorized the Commission to prescribe the forms of accounts, records, and memoranda, which shall include accounts, records and memoranda of the movements of traffic, as well as the receipts and expenditures of money, to which accounts, records and memoranda the Commission is given access at all times. The railroads are not allowed to keep any other than those prescribed by the Commission. The Commission is empowered to appoint agents or examiners with authority to inspect and examine such accounts, records and memoranda, and provision is made, penalizing the failure to comply with the orders of the Commission concerning such accounts, records and memoranda, or the falsification thereof, or the willful destruction or mutilation thereof, or the failure to make full, true and correct entries in such accounts, records and memoranda of all facts and transactions pertaining to the carrier's business, or keeping any other accounts, records and memoranda.

Reading these provisions of the Act, there is nothing to suggest that they were intended to include correspondence relative to the railroad's business. In recommending the passage of the Act, the Commission did not suggest that it was essential to its purpose to have an inspection of the correspondence of the railroad. And, with its expert consideration of the questions involved and having clearly in mind the authority it was intended to secure, it can scarcely be supposed that the Commission would have confined its proposed amendment to the carefully chosen words "accounts, records or memoranda," and would have omitted the word "correspondence," if it had intended to include the latter. If we apply the rule of construction,—*noscitur a sociis*,—we fird that all the provisions of the Act as to the inspection of accounts have relation to such as are kept in the system of bookkeeping to be prescribed by the Commission. It would be a great stretch of the meaning of the term as here used, to make "memoranda" include correspondence. The "records" of a corporation import the transcript of its charter and by-laws, the minutes of its meetings—the books containing the accounts of its official doings and the written evidence of its contracts and business transactions. Certainly it was not intended that the Commission should prescribe the forms of correspondence, although it was given the power to prescribe the forms of all accounts, records and memoranda subject to the provisions of the Act.

It is urged that the amendment to § 20 of February 25, 1909, adding a proviso to paragraph 7, shows the intention of Congress to provide for accounts, records and memoranda, including more than those as to which the form may be prescribed by the Commission, and in the word "document" making this section broad enough to include correspondence. The language of this proviso is as follows (35 Stat. 648, c. 193):

"Any person who shall willfully make any false entry

in the accounts of any book of accounts or in any record or memoranda kept by a carrier, or who shall willfully destroy, mutilate, alter, or by any other means or device falsify the record of any such account, record, or memoranda, or who shall willfully neglect or fail to make full, true, and correct entries in such accounts, records, or memoranda of all facts and transactions appertaining to the carrier's business, or shall keep any other accounts, records, or memoranda than those prescribed or approved by the commission, shall be deemed guilty of a misdemeanor, and shall be subject, upon conviction in any court of the United States of competent jurisdiction, to a fine of not less than one thousand dollars nor more than five thousand dollars or imprisonment for a term not less than one year nor more than three years, or both such fine and imprisonment: Provided, that the commission may in its discretion issue orders specifying such operating, accounting, or financial papers, records, books, blanks, tickets, stubs, or documents of carriers which may, after a reasonable time, be destroyed, and prescribing the length of time such books, papers, or documents shall be preserved."

It may be that the section is broad enough, particularly when read in the light of this proviso, to authorize an inspection of accounts, records and memoranda for which no form has been prescribed by the Commission, but we do not find in this proviso anything to indicate that Congress in the original act or the amendment intended to provide for the compulsory inspection of correspondence.

There is nothing from the beginning to the end of the section to indicate that Congress had in mind that it was making any provisions concerning the correspondence received or sent by the railroad companies. The primary object to be accomplished was to establish a uniform system of accounting and bookkeeping, and to have an inspection thereof. If it intended to permit the Commission

to authorize examiners to seize and examine all correspondence of every nature, Congress would have used language adequate to that purpose. A sweeping provision of that nature, attended with such consequences, would not be likely to have been enacted without probable exceptions as to some lines of correspondence required to be kept open and subject to inspection upon demand of the agents of the Government.

In the brief filed on behalf of the United States, it is frankly admitted that there is much force in the objection that Congress did not intend in this grant of authority to include the confidential correspondence of the railroad companies between itself and its counsel, and it is admitted that in this respect the demand of the agent of the Commission may be too broad. The desirability of protecting confidential communications between attorney and client as a matter of public policy is too well known and has been too often recognized by text-books and courts to need extended comment now. If such communications were required to be made the subject of examination and publication, such enactment would be a practical prohibition upon professional advice and assistance. *Connecticut Mutual Life Insurance Co.* v. *Schaefer,* 94 U. S. 457, 458. And see the comments of this court in *Blackburn* v. *Crawfords,* 3 Wall. 175, 192.

How far such a demand as embodied in this petition can be permitted within the constitutional rights set up by the defendant, we do not need to consider, as we do not think that the section of the act of Congress under which the demand was made authorizes the compulsory submission of the correspondence of the company to inspection. It is true that correspondence may contain a record, and it may be the only record of business transactions, but that fact does not authorize a judicial interpretation of this statute which shall include a right to inspection which Congress did not intend to authorize.

The court below held that the right to demand inspection of documents before August 29, 1906, the date when the Hepburn Act went into effect, was of such a doubtful character that the writ ought not to issue. We think the right of inspection and examination given by the Interstate Commerce Act by the amendment to § 20, was not intended to be limited to such accounts, records, and memoranda only as were made after the passage of the Act, but is intended to permit an examination of all such accounts, records, and memoranda, for the purpose of carrying out the provisions of the Act. It is not contended that Congress might not do this within its constitutional authority, and the argument is that it had no such right in contemplation and did not intend to authorize it; but we think it is clear from the terms of the act, read in the light of its purpose, that Congress did not intend to draw the line of inspection at preëxisting accounts, records, and memoranda.

The Government argues that if it be held that the prayer for the writ of mandamus and the accompanying motion were too broad in requiring the production of confidential communications between attorney and client which were contained in this correspondence, nevertheless the court should have issued its writ of mandamus in so far as the relator showed it was entitled thereto, and the case of *West Virginia Northern R. R.* v. *United States,* 134 Fed. Rep. 198, 203, is cited to the effect that such practice is permissible. The case shows, however, an amendment was permitted so as to make the writ conform to the rights which could be properly granted. And that course might have been pursued in this case.

Whether the Commission would desire an inspection of the accounts, records and memoranda as we have construed the terms of the Act, without the right to examine the correspondence we are not advised. As the petition in this case was dismissed by the court below

without prejudice, and a new proceeding my be staarted, asking for such inspection as the law allows, we think the order of the court refusing to grant the writ of mandamus in the broad terms prayed for in the petition and the motion for the writ should not be reversed to permit a grant of relief within the limits which the law allows as we interpret it.

It follows that the judgment of the District Court, refusing the writ and dismissing the petition should be

*Affirmed.*

Mr. Justice McReynolds took no part in the consideration and decision of this case.