632 So.2d 1377 (1994)
SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, Petitioner,
v.
J. Terry Deason, et al., Respondents.
Nos. 81487, 81716, 81926 and 82196.
Supreme Court of Florida.
March 10, 1994.
*1379 Marshall M. Criser, Robert J. Winicki, David M. Wells and William W. Deem, Jacksonville, and Harris R. Anthony and J. Phillip Carver, Mahoney, Adams & Criser, P.A., Tallahassee, Robert G. Beatty, Southern Bell Tel. & Tel. Co., Miami, and J. Robert Fitzgerald and Roger M. Flynt, Jr., Vice President and Gen. Counsel, Southern Bell Tel. & Tel. Co., Atlanta, GA, for petitioner.
Robert Vandiver, Gen. Counsel, and Richard D. Bellak, Associate Gen. Counsel, FL Public Service Com'n, Robert A. Butterworth, Atty. Gen., Jason Vail and Michael Twomey, Asst. Attys. Gen., Jack Shreve, Public Counsel, Charles J. Beck, Deputy Public Counsel and Janis Sue Richardson, Associate Public Counsel, Office of Public Counsel, Tallahassee, on behalf of Citizens of State of FL, for respondents.
McDONALD, Justice.
We review the non-final administrative orders of the Public Service Commission *1380 (PSC),[1] which direct Southern Bell Telephone and Telegraph Company (Southern Bell) to disclose certain documents to the PSC. We have jurisdiction pursuant to article V, section 3(b)(2) of the Florida Constitution.

Case History
In February 1991, the Office of Public Counsel petitioned the PSC to investigate allegations that Southern Bell falsified information regarding its compliance with Rules 25-4.070(2) and 25-4.110(2), Fla. Admin. Code, requiring rebates for the untimely repair of telephone service. The PSC, which had already begun to informally investigate similar allegations against Southern Bell, formally initiated an investigation of Southern Bell in May 1991. In January 1993, the PSC consolidated the investigation docket with Southern Bell's pending rate case.[2] The basis for the PSC's decision to consolidate was the "belief that to attempt to separate and isolate the issues between rate case and investigation matters would not be efficient and perhaps, not possible." Order No. PSC-93-0390-FOF-TC (March 15, 1993).
In the series of consolidated cases now before us, Public Counsel filed various motions to compel the production of documents from Southern Bell. Each case in these proceedings involves the discovery of a different category of information. Case number 81,487 involves investigative audits and panel recommendations. Case number 81,716 involves the statements of Southern Bell employees regarding their experiences in the customer repair service operation, a statistical analysis performed by a Southern Bell employee on the company's repair and rebate systems, the work notes of Human Resources personnel concerning craft/management disciplinary issues, and deposition testimony by the company's chief auditor regarding the allegedly privileged audits. Case number 82,196 involves the deposition testimony of several upper-level employees of Southern Bell and their information about employee discipline matters. Finally, case number 81,926 involves the National Association of Regulatory Utility Commissioners' request for complete audit access to Southern Bell's affiliated companies. In each case, the PSC ordered Southern Bell to produce the documents.[3] Southern Bell requests this Court to quash the PSC orders compelling production and argues that the documents are protected under the attorney-client privilege and/or the work product doctrine.

The Attorney-Client Privilege
The attorney-client privilege applies to confidential communications made in the rendition of legal services to the client. § 90.502, Fla. Stat. (1991). Section 90.502(1)(b) defines "client" as "any person, public officer, corporation, association, or other organization or entity, either public or private, who consults a lawyer with the purpose of obtaining legal services or who is rendered legal services by a lawyer." (Emphasis added). Clearly, Florida law applies the attorney-client privilege to corporations such as Southern Bell. § 90.502(1)(b); see also, United States v. Louisville & N.R.R., 236 U.S. 318, 35 S.Ct. 363, 59 L.Ed. 598 (1915). What are not so clear, however, are the legal standards which should be used to determine whether the elements of the attorney-client privilege in the corporate context have been satisfied.
In City of Philadelphia v. Westinghouse Elec. Corp., 210 F. Supp. 483 (E.D.Pa. 1962), the court adopted the following "control group test" to determine who may communicate *1381 as the "client" for purposes of the attorney-client privilege:
[I]f the employee making the communication, of whatever rank he may be, is in a position to control or even to take a substantial part in a decision about any action which the corporation may take upon the advice of the attorney, or if he is an authorized member of a body or group which has that authority, then, in effect, he is (or personifies) the corporation when he makes his disclosure to the lawyer and the privilege would apply.
Id. at 485.[4] Although some courts and commentators have found the control-group test to be easily applicable,[5] the test fails to recognize the crucial role middle and lower-level employees play in the corporation's activities. Upjohn Co. v. United States, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Although upper-echelon management may be responsible for making decisions on behalf of the corporation, the noncontrol-group employees are frequently the ones responsible for implementing those decisions. Thus, an attorney representing the corporation is charged with gathering the facts from employees with information relevant to the corporation's legal problem, regardless of their rank.
In Upjohn, independent accountants informed Upjohn's general counsel that one of the company's foreign subsidiaries bribed foreign officials in order to secure government business. In response to this information, Upjohn's general counsel conducted an internal investigation of the questionable payments and sent questionnaires to the foreign managers requesting information regarding the payments. Upjohn voluntarily submitted a preliminary report to both the Securities and Exchange Commission (SEC) and the Internal Revenue Service (IRS). The IRS issued a summons demanding production of the questionnaires, memoranda, and notes of the interviews conducted with Upjohn employees. Rejecting the control-group test, the Supreme Court held that the attorney-client privilege protected the employees' communications from disclosure.
In the PSC orders compelling Southern Bell to disclose the documents at issue, the PSC acknowledged Upjohn but did not consider it dispositive.[6] The PSC reasoned that Upjohn is factually distinguishable from the instant case because Upjohn's operations were not regulated by rule and statute as Southern Bell is. Thus, the PSC relied on Consolidated Gas Supply Corp., 17 Fed.Energy Reg.Comm'n Rep. (CCH) ¶ 63,048 (Dec. 2, 1981) and In re Notification to Columbia Broadcasting System Concerning Investigation by CBS of Incidents of "Staging" by its Employees of Television News Programs, 45 F.C.C.2d 119 (1973). In Consolidated Gas, the motions judge adopted the "narrow" view of the attorney-client privilege, noting that the regulating agency had a "duty to protect the public interest" and a "continuing obligation" to ensure that the company satisfied the requirements of the Natural Gas Act.[7] Similarly, in CBS, the Federal Communications Commission ruled that a licensee's assertion of the attorney-client privilege is not "compatible with a licensee's duty to be forthcoming with information relevant to its operation under the statutory public interest standard." CBS, 45 F.C.C.2d at 123. In the *1382 instant case, the PSC depended on Consolidated Gas and CBS to support its premise that the PSC's investigatory and regulatory powers permit it to inspect Southern Bell's documents. The PSC further argues that as a regulated entity, Southern Bell has a continuing obligation to comply with PSC regulations and a concomitant need to seek legal advice to ensure its compliance. The PSC is specifically empowered with broad authority to regulate telecommunications companies such as Southern Bell.[8] Even though the PSC has a statutory duty to ensure Southern Bell's compliance with the law, the PSC cannot exercise its regulatory power at the expense of destroying the corporate attorney-client privilege. Southern California Gas Co. v. Public Utilities Comm'n, 50 Cal.3d 31, 265 Cal. Rptr. 801, 784 P.2d 1373 (1990).
In another case involving a regulated company, United States v. Louisville & Nashville Railroad Co., 236 U.S. 318, 35 S.Ct. 363, 59 L.Ed. 598 (1915), the Interstate Commerce Commission (ICC) attempted to examine confidential communications between a railroad and its attorneys. The ICC argued that its power to examine records and correspondence under the Interstate Commerce Act authorized such an inspection, but the Court concluded that disclosure of the company's communications "would be a practical prohibition upon professional advice and assistance." Id. at 336, 35 S.Ct. at 369. To a certain extent, all companies operating in the United States are regulated by some governmental agency and have an obligation to abide by general laws and/or specific administrative rules.[9] Southern Bell's status as a regulated company does not entitle the regulating body to unfettered access to Southern Bell's confidential communications.
The question of what constitutes a confidential communication in the corporate context, and under what circumstances such a communication should be protected, presents a quandary unresolved by this court or the United States Supreme Court. Upjohn applied the attorney-client privilege to corporations, but the Court deliberately refrained from defining the parameters for applying the privilege to corporations. The variety of documents involved in this case requires us to adopt a set of standards that will facilitate our decision of whether to compel disclosure of the requested documents. Having rejected the control group test, we look to the standards suggested by others courts which have addressed the corporate attorney-client privilege.
In Harper & Row Publishers, Inc. v. Decker, 423 F.2d 487 (7th Cir.1970), aff'd per curiam by an equally divided court, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971), the court articulated the subject matter test to determine the scope of the attorney-client privilege:

*1383 [A]n employee of a corporation, though not a member of its control group, is sufficiently identified with the corporation so that his communication to the corporation's attorney is privileged where the employee makes the communication at the direction of his superiors in the corporation and where the subject matter upon which the attorney's advice is sought by the corporation and dealt with in the communication is the performance by the employee of the duties of his employment.
Id. at 491-92. We believe that the subject-matter test adds a condition to the corporate privilege that more completely addresses one of the perplexing problems presented in the instant case: the issue of whether the communications made to Southern Bell were made in the course of seeking legal services. Because the nature of the corporation differs significantly from the individual person, the attorney-client privilege will also differ in its application to the corporation and to the natural person. First, a corporation can only act through its agents, whereas a natural person can seek legal advice and then directly act (or not act) upon that advice. Second, a corporation relies on its attorney for business advice more than the natural person. Thus, it is likely that the "zone of silence" will be enlarged by virtue of the corporation's continual contact with its legal counsel. Radiant Burners, Inc. v. American Gas Ass'n, 207 F. Supp. 771, 774 (N.D.Ill. 1962).
Discovery facilitates the truth-finding process, and although this process constitutes the core of any litigation, it must be tempered by the established interest in the free flow of information between an attorney and client. "Any standard developed, therefore, must strike a balance between encouraging corporations to seek legal advice and preventing corporate attorneys from being used as shields to thwart discovery." First Chicago International v. United Exchange Co. Ltd., 125 F.R.D. 55, 57 (S.D.N.Y. 1989). Thus, to minimize the threat of corporations cloaking information with the attorney-client privilege in order to avoid discovery, claims of the privilege in the corporate context will be subjected to a heightened level of scrutiny.
The burden of establishing the attorney-client privilege rests on the party claiming it. Fisher v. United States, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). Combining the tests established in Harper & Row and in Diversified Industries, Inc. v. Meredith, 572 F.2d 596 (8th Cir.1977),[10] we set forth the following criteria to judge whether a corporation's communications are protected by the attorney-client privilege:
(1) the communication would not have been made but for the contemplation of legal services;
(2) the employee making the communication did so at the direction of his or her corporate superior;
(3) the superior made the request of the employee as part of the corporation's effort to secure legal advice or services;
(4) the content of the communication relates to the legal services being rendered, and the subject matter of the communication is within the scope of the employee's duties;
(5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.

The Work Product Doctrine
Southern Bell also claims that the documents which the PSC has compelled it to produce are protected by the work product *1384 doctrine. Pursuant to Florida Rule of Civil Procedure 1.280(b)(3), materials prepared in anticipation of litigation by or for a party or its representative are protected from discovery, unless the party seeking discovery has need of the material and is unable to obtain the substantial equivalent without undue hardship. The rationale supporting the work product doctrine is that "one party is not entitled to prepare his case through the investigative work product of his adversary where the same or similar information is available through ordinary investigative techniques and discovery procedures." Dodson v. Persell, 390 So.2d 704, 708 (Fla. 1980). Fact work product traditionally protects that information which relates to the case and is gathered in anticipation of litigation. State v. Rabin, 495 So.2d 257 (Fla. 3d DCA 1986). Opinion work product consists primarily of the attorney's mental impressions, conclusions, opinions, and theories. Id. Whereas fact work product is subject to discovery upon a showing of "need" and "undue hardship," opinion work product generally remains protected from disclosure. See Upjohn; Rabin.
Although the attorney-client privilege and the work product doctrine serve separate purposes, the legal issues associated with these concepts overlap in the instant case. Relying on First Chicago and Soeder v. General Dynamics Corp., 90 F.R.D. 253 (D.Nev. 1980), the PSC found that the documents withheld by Southern Bell were created for a business purpose and therefore were not protected by either the attorney-client privilege or the work product doctrine. According to the PSC, Southern Bell had an independent business need to perform its own internal investigation. The PSC also argues that Southern Bell's use of the investigative materials to overhaul its telephone repair process and to discipline company employees confirms its business purpose. Southern Bell counterargues that, in light of the allegations of impropriety against it, the company had a legal motive for collecting the information now being requested for production.

Case Number 81,487
Applying the above standards to the instant case requires separate consideration of each type of information that the PSC and Public Counsel have requested Southern Bell to produce. In case number 81,487, the PSC ordered Southern Bell to produce five investigative audits.[11] In April 1991, two months after Public Counsel requested the PSC to investigate Southern Bell's alleged improprieties, Southern Bell's counsel requested the audit department to review and analyze certain data regarding LMOS, MOOSA, KSRI, and PSC Schedule II activity. The analyses of this data are known as the investigative audits.
The PSC and Public Counsel claim that neither the attorney-client privilege nor the work product doctrine protect the investigative audits from disclosure. We find that the audits cannot be classified as a "communication" for the purposes of the attorney-client privilege. The audits consist of systematic analyses of data and cannot be considered the type of statement traditionally protected as a "communication." The audits do, however, fall within the definition of work product. Public Counsel argues that Southern Bell had a clear business purpose in monitoring its service quality and conducted the audits in response to a slip in customer service standards. In its order, the PSC stated:
Internal audits are a routine vehicle for a regulated business to inform itself about its operations and to report about those operations to a regulatory agency.... Those business documents do not become privileged merely because non-routine developments require audits to be scheduled out of sequence or because the documents are handed over to an attorney.
Although Southern Bell regularly conducts audits for regulatory purposes and to ensure *1385 that its operations are running efficiently, the audits at issue were not conducted for either of these purposes.[12] Rather, they were conducted at the request of counsel in direct response to the PSC's investigation. Thus, the audits were prepared in anticipation of litigation and are protected as fact work product.
Florida Rule of Civil Procedure 1.280(b)(3) permits the disclosure of work product if the party seeking discovery "has need of the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Public Counsel and the PSC contend that the audits are not obtainable from any other source because the information cannot be duplicated without the use of Southern Bell's complex, integrated computer system.[13] Southern Bell points out that the audits are "analyses of information," and that Public Counsel is entitled to analyze the underlying data on which the audits are based. The underlying data consists, in part, of over 1,000,000 trouble repair reports. Although we agree with Southern Bell that it is possible to replicate the information, the standard for producing work product is not whether the replication effort is possible, but whether it causes undue hardship. We find that it would be an unduly arduous and unrealistic task to expect any party, regardless of their resources, to be able to analyze such an enormous amount of information. This is precisely the type of situation that the "undue hardship" qualification in rule 1.280(b)(3) envisioned. Therefore, Southern Bell is directed to produce the five internal audits.
Case number 81,487 also involves panel recommendations, which were originally generated from statements company employees made to security personnel at the direction and request of Southern Bell's counsel. Counsel subsequently shared the contents of the employee interviews with personnel managers, who then summarized the information and made recommendations regarding disciplinary action against certain employees. These summaries are known as the panel recommendations. Because the issue here concerns the employees' statements to security personnel and not to the attorney, we hold that the attorney-client privilege does not apply.[14]
Southern Bell argues, alternatively, that the panel recommendations are protected as work product. Thus, once again, we reach the question of whether these materials were prepared in anticipation of litigation or whether, as Public Counsel argues, they were created for the business purpose of disciplining employees. When a corporation seeks the advice of an attorney, it is difficult to differentiate the role of a legal advisor from the role of a business advisor. In the instant case, the line between law-related communications and business communications is especially blurry.
Although it is evident that the employees' interviews with security personnel were directed by counsel in anticipation of litigation, the purpose of management personnel summarizing the results of the interviews is not as evident. The company's investigation of a legal problem led to the discovery of a potential company business problem. Southern Bell argues that the recommendations contain counsel's mental thoughts and impressions. We find Southern Bell's factual assertion to be inaccurate. The company developed information through an investigation that it memorialized in an alleged work product document. Southern Bell then took this work product, extracted information from it, *1386 and created a second set of documents  the panel recommendations. The recommendations contain the thoughts and impressions of the personnel managers based on counsel's communications to them. Although Southern Bell has proven that the employee interviews were conducted in anticipation of litigation, it has not proven that the panel recommendations were prepared for anything other than management's decision to consider whether is should discipline company employees. The disciplining of employees is a matter within the ordinary course of business even if it arises out of the PSC's investigation of Southern Bell. The fact that the panel recommendations were based on work product does not convert them into work product. Therefore, Southern Bell is ordered to produce the panel recommendations, but it is authorized to redact any notes, thoughts, or impressions of Southern Bell's counsel that are printed directly on the materials.[15]

Case Number 81,716
In case number 81,716, the PSC compelled discovery of the following documents: 1) a statistical analysis performed by Southern Bell; 2) statements made by Southern Bell employees to counsel; 3) work notes of Human Resources personnel, and; 4) deposition testimony. Southern Bell claims that these documents are protected from discovery by the attorney-client privilege and/or the work product doctrine.
The statistical analysis was performed by Southern Bell's Assistant Vice President for Central Office Operations Support, Mr. Danny L. King. The evidence is uncontroverted that Southern Bell's Legal Department requested King to perform a statistical analysis to determine the veracity of the information obtained in the investigation and to quantify any significant deviation. According to his affidavit, King was provided with specific information and analyzed the information using a database that contained trouble histories for various years. The statistical analysis, like the internal audits at issue in case number 81,487, is not a "communication" for purposes of the attorney-client privilege. However, the nature of the document and the factual circumstances under which the analysis was created support a finding that the analysis is work product. We find insufficient any claim that the work product exception should apply to these documents and Southern Bell is not compelled to disclose the statistical analysis.
The second set of documents at issue in case number 81,716 are statements Southern Bell employees made to Southern Bell's counsel. Applying the standards for the attorney-client privilege set forth in this opinion, we find that the employees' statements which were made directly to counsel are privileged. Statements made to security personnel, like the statements made to security that were included in the panel recommendations, are not protected by the privilege. Counsel's summaries of the employees' statements, whether the statements were communicated to counsel, to security, or to any other personnel, are protected as work product.
Counsel ultimately shared the employees' statements with managers in Southern Bell's human resources department, who took work notes of counsel's summaries. As stated above, the original statements made by the employees to counsel are privileged. Counsel's decision to share these privileged communications with managers in the company who had a "need to know" the information does not strip the information of its privileged status. Counsel had a duty to render legal services to the company, and in turn, the company has a right to internal business use of privileged documents generated by its own company employees. Thus, these statements remain privileged.
Southern Bell also challenges the PSC's order compelling the deposition testimony of Shirley T. Johnson, Southern Bell's Operations Manager for internal auditing, concerning the preparation and contents of the investigative audits. Southern Bell claims that if the attorney-client privilege or work product doctrine precludes discovery of the written *1387 communication, Public Counsel cannot seek the substance of the communications orally.[16] Because we held in case 81,487 that the investigative audits are discoverable, there is no logical reason why the person with information concerning those audits should not be deposed. Thus, we agree with the PSC's order compelling the testimony of Shirley Johnson.

Case Number 82,196
The production of deposition testimony of three Southern Bell employees is also the issue in case number 82,196. Public Counsel conducted the deposition of three Southern Bell employees: C.L. Cuthberson, Jr., General Manager of Human Resources; C.J. Sanders, Vice-President for Network; and Dwayne Ward, Operations Manager of Human Resources. These three individuals reviewed the employees' statements that were communicated to them by counsel. As with the deposition of Shirley Johnson, Southern Bell instructed these three employees not to answer certain questions regarding employee discipline matters based upon the attorney-client privilege and the work product doctrine. Public Counsel then sought information regarding any disciplinary action these managers decided to take as a result of the employees' statements. Public Counsel moved to compel and the PSC issued an order compelling the answers to the deposition questions.
Southern Bell claims that Cuthberson, Sanders, and Ward have no firsthand knowledge of the facts sought by Public Counsel and that any information they have comes from their review of the privileged witness statements and counsel's notes and summaries. According to Southern Bell, requiring these deponents to answer questions about the disciplinary measures taken toward certain employees will necessarily reveal the contents of the privileged communications. Public Counsel and the PSC contend that Southern Bell waived the attorney-client privilege when counsel disseminated the information to Cuthberson, Sanders and Ward. Further, Public Counsel and the PSC argue that they are only seeking facts from the depositions, not the substance of the communications from the employees to the attorney.
Under Upjohn, the communication between the attorney and client is privileged, but the underlying facts are discoverable. 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584. The instant case presents the difficulty of deciphering the communication from the underlying facts. Public Counsel claims that it did not ask the deponents what the company attorneys told them; rather, Public Counsel only asked why the employees were disciplined or what actions of the employees resulted in discipline. Differentiating between these questions is merely a game of semantics. The privileged information which counsel gave to the managers describes the actions of the employees. To answer Public Counsel's questions regarding the specific reasons the employees were or were not disciplined would necessarily require the deponents to reveal the contents of the privileged communication. Public Counsel cannot obtain indirectly through depositions that information which the law does not permit it to obtain directly through disclosure of the written privileged communication. Therefore, Public Counsel and the PSC are restricted from questioning the deponents in a manner that would require them to reveal the content of the communication.[17]

*1388 Case Number 81,926

The final case, case number 81,926, arose in November 1991, when the National Association of Regulatory Utility Commissioners (NARUC) authorized regional multi-state audits of the seven Bell Regional Companies, including Southern Bell. NARUC assembled an audit team, consisting of individuals from several southeastern states, to oversee the audit. Because the audit team was unable to reach an agreement with Southern Bell with respect to the disclosure of proprietary information, the audit team proposed to the PSC that the audit be conducted pursuant to the PSC's statutory authority, rules, and regulations. The PSC approved the proposal and allowed the audit team to proceed as part of the already pending Southern Bell rate case.[18]
In October 1992, the audit team issued its first data request of 103 items. According to the PSC, the company has failed to respond to 44 of the items requested, has objected to 15 of them, and is "substantially deficient" in 14 of their responses. Order No. PSC-93-0424-FOF-TL, p. 3. Based on the language of section 364.183, Florida Statutes (1991), the PSC ordered Southern Bell to provide access to the requested records. Subsection 364.183(1) provides in part:
The commission shall have reasonable access to all company records, and to the records of the telecommunications company's affiliated companies, including its parent company, regarding transactions or cost allocations among the telecommunications company and such affiliated companies, and such records necessary to ensure that a telecommunications company's ratepayer do not subsidize the company's unregulated activities.
Southern Bell contends that the affiliates are completely separate and distinct from Southern Bell, engaged in different enterprises in different states, with their own management structure. Thus, according to Southern Bell, the company has no means to force the affiliates to allow the audit team access to their documents.[19]
We disagree with Southern Bell's characterization of the issue in this case. According to Florida Rule of Civil Procedure 1.350, any party may request any other party to produce documents within the scope of rule 1.280 and that are in the "possession, custody, or control of the party to whom the request is directed." In the eyes of Southern Bell, the issue is whether the affiliates' general ledgers and financial statements are within Southern Bell's possession, custody, or control. In our eyes, however, the issue presented by this case is whether section 364.183 provides the PSC with the authority to gain access to the records of Southern Bell's affiliates. We hold that the statute's plain language authorizes the PSC's access to the affiliates' records requested by the audit team.
As the regulating body for telecommunications companies, the PSC is charged with ensuring that a company's non-regulated activities are not subsidized by ratepayers, the company's regulated rates, or by a company's affiliates. §§ 364.01 and 364.183, Fla. Stat. (1991). To satisfy this obligation, the legislature has granted the PSC the power to inspect the audits of the telecommunications companies and their affiliates. Southern Bell attempts to apply the rules of discovery to *1389 the instant case in an effort to limit the PSC's access to its affiliates' documents. However, unlike the cases discussed above, the documents at issue in case number 81,926 were not sought in order to gather facts for litigation. Rather, the mission of the audit team was designated by NARUC and is consistent with the PSC's regulatory power to ensure against cross-subsidization. The audit team is not involved in legal proceedings before the PSC or before this Court. Thus, because NARUC's request for the affiliates' documents was not sought in furtherance of a legal discovery effort, the documents are subject to the statute governing the regulation of telephone companies and not to the rules of discovery. Without ambiguity, the plain language of the governing statute authorizes the PSC to access the records of Southern Bell and its affiliates in order to ensure compliance with the law. Therefore, Southern Bell and its affiliates are ordered to comply with the audit team's data request.
It is so ordered.
BARKETT, C.J., and OVERTON, SHAW, GRIMES and KOGAN, JJ., concur.
HARDING, J., did not participate.
NOTES
[1] PSC-93-0292-FOF-TL (Feb. 2, 1993), PSC-93-0517-FOF-TL (April 6, 1993), PSC-93-1016-FOF-TL (July 12, 1993), and PSC-93-0424-FOF-TL (March 22, 1993). We understand that the underlying controversy has been settled and this review is seemingly moot. Because the issue is subject to repetition, we publish our opinion.
[2] Southern Bell proposed a rate sharing plan that would provide incentives to the company to maximize customer service efficiencies in exchange for an opportunity to retain a greater share of any profits arising therefrom. This proposal, known as the incentive regulation plan, would operate in place of the traditional rate of return regulation.
[3] In the instant case, a member of the PSC, Susan Clark, sat as the prehearing officer and issued the orders for these cases. Commissioner Clark then heard and voted on the cases when the entire PSC later reviewed the orders.
[4] Other courts have also adopted the control group test. National Tank Co. v. Brotherton, 851 S.W.2d 193 (Tex. 1993) (Texas rules of evidence adopt the control group test); Consolidation Coal Co. v. Bucyrus-Erie Co., 89 Ill.2d 103, 59 Ill.Dec. 666, 432 N.E.2d 250 (1982) (defining control group to include top managerial decision makers as well as those with pertinent advisory responsibility).
[5] Note, Attorney-Client Privilege for Corporate Clients: The Control Group Test, 84 Harv.L.Rev. 424 (1970).
[6] Because each PSC order addresses a different category of discovery information, the orders differ slightly. However, the arguments supporting the PSC's decision in each case are virtually the same and thus, the PSC orders are addressed collectively in this opinion.
[7] The "narrow view" applies the attorney-client privilege when "the statements in fact do reveal, directly or indirectly, the substance of confidential communication by the client." In re Fischel, 557 F.2d 209, 211 (9th Cir.1977). The "broad view," on the other hand, considers virtually all communication from an attorney to a client to be privileged. Jack Winter, Inc. v. Koratron Co., 54 F.R.D. 44, 46 (N.D.Cal. 1971).
[8] Section 364.01(3), Florida Statutes, (1991) provides in pertinent part:

(3) The commission shall exercise its exclusive jurisdiction in order to:
(a) Protect the public health, safety, and welfare by ensuring that basic telecommunications services are available to all residents of the state at reasonable and affordable prices.
(b) Protect the public health, safety, and welfare by ensuring that monopoly services provided by a local exchange telecommunications company continue to be subject to effective rate and service regulation.
(c) Encourage cost-effective technological innovation and competition in the telecommunications industry if doing so will benefit the public by making modern and adequate telecommunications services available at reasonable prices.
(d) Ensure that all providers of telecommunications services are treated fairly, by preventing anticompetitive behavior and eliminating unnecessary regulatory restraint.
(e) Recognize the continuing emergence of a competitive telecommunications environment through the flexible regulatory treatment of competitive telecommunications services, where appropriate, if doing so does not reduce the availability of adequate basic local exchange service to all citizens of the state at reasonable and affordable prices, if competitive telecommunications services are not subsidized by monopoly telecommunications services, and if all monopoly services are available to all competitors on a nondiscriminatory basis. (f) Continue its historical role as a surrogate for competition for monopoly services provided by local exchange telecommunications companies.
[9] In Upjohn, the pharmaceutical company was governed by both the Internal Revenue Service and the Securities and Exchange Commission. We find Upjohn as persuasive authority and disagree with the PSC's factual distinction between Upjohn and the instant case.
[10] In Diversified Industries, Inc. v. Meredith, 572 F.2d 596 (8th Cir.1977), the court modified the subject matter test in an effort to focus on why the attorney was consulted and to prevent the routine channeling of information through the attorney to prevent subsequent disclosure. According to the Diversified Industries test, the attorney-client privilege applies if:

(1) the communication was made for the purpose of securing legal advice;
(2) the employee making the communication did so at the direction of his corporate superior;
(3) the superior made the request so that the corporation could secure legal advice;
(4) the subject matter of the communication is within the scope of the employee's corporate duties, and;
(5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.
[11] The internal audits include the following documents:

1. Customer Adjustment  Loop Operations System (LMOS).
2. Mechanized Adjustments  Mechanized Out of Service Adjustments (MOOSA).
3. Key Service Results Indicator (KSRI)  Network Customer Trouble Rate.
4. PSC Schedule II.
5. Network Operational Review.
[12] We hold that section 364.183(1), Florida Statutes (1991), does not apply to documents that are sought as part of discovery in a legal proceeding.
[13] In Public Counsel's Seventh Motion to Compel and Request for In Camera Inspection of Documents, Public Counsel alleges that

the data is processed through a complex computer system, which is designed to interact with the customer on initial call-in, with various employees throughout the trouble reporting and rebate process, and at times automatically. This complex system of hardware and software programs comprises linked programs, each of which has its own next of subprograms and subroutines that massage customer data.
[14] Southern Bell's claim that counsel directed, controlled, and was sometimes present at the employee interviews does not invoke the privilege.
[15] We reiterate that the information recited to the managers by Southern Bell's counsel is not to be redacted.
[16] During Public Counsel's deposition of Johnson, Southern Bell's attorney instructed her as follows:

Miss Johnson, as you know, the Southern Bell Legal Department conducted an investigation regarding the matters pertaining to this particular docket about which we are here today. That investigation, as you also know, was undertaken pursuant to the attorney-client privilege and the attorney work product doctrine and thus is it [sic] privileged and protected from disclosure to third persons. Because of that, we would request that you not divulge any information at all regarding the substance of that investigation. Of course, you are always permitted to testify with regard to any personal knowledge that you have that was not obtained from the investigation.
[17] Public Counsel and the PSC are, of course, free to depose the company employees who were disciplined. We are aware that, to some extent, some of the disciplined employees have already been deposed. We are also aware that in some cases, the employees either denied wrongdoing or were instructed not to answer questions on the basis of the privilege. We emphasize that the employees may testify to any information about which they have knowledge, except that which they learned solely from communication that emanated from counsel.
[18] Because Southern Bell has not complained of the PSC's initial decision to grant the NARUC audit team the authority to conduct the audit, we do not address that issue.
[19] Southern Bell claims that the following documents remain beyond its possession, custody or control:

1) Financial statements of BellSouth Information Networks, and general ledgers of both BellSouth Advanced Networks and BellSouth Information Networks;
2) General ledgers of Sunlink Corporation;
3) General ledgers of BellSouth Capital Funding Corporation;
4) General ledgers of BellSouth Resources, Inc.;
5) General ledgers of Dataserv Financial Services, Inc.;
6) Financial statements for BellSouth Direct Marketing; and
7) Financial statements and general ledgers of BellSouth Enterprises, Inc.