837 So.2d 1010 (2002)
GENERAL MOTORS CORPORATION, a Foreign Corporation, General Motors Corporation Buick, Oldsmobile, Cadillac Group, and General Motors Corporation Oldsmobile Division, Appellants,
v.
Robert J. McGEE, Individually, Constance McGee, Individually, Kelly Amber McGee, a Minor, through her Parents and Natural Guardians, Robert J. McGee and Constance McGee, and Robert J. McGee and Constance McGee, as Personal Representatives of the Estate of Shane McGee, Deceased, Valley Forge Insurance Company, a Pennsylvania Corporation, Progressive American Insurance Company, a Florida Corporation, State Farm Mutual Automobile Insurance Company, an Illinois Corporation, and Valley Industries, Inc., Appellees.
Nos. 4D98-2795, 4D99-240.
District Court of Appeal of Florida, Fourth District.
December 18, 2002.
As Modified On Grant of Clarification March 5, 2003.
*1014 Frank M. Hinman, David M. Heilbron, Joy K. Fuyuno, Anthony T. Falzone, Monty Agarwal, and Christina M. Wheeler of Bingham McCutchen, LLP, San Francisco, California, William L. Kirk, Jr., and Daniel J. Gerber of Rumberger, Kirk & Caldwell, P.A., Orlando, John H. Pelzer, and Terrence Russell of Ruden, McClosky, Smith, Schuster & Russell, P.A., Fort Lauderdale, and John Beranek of Ausley & McMullen, Tallahassee, for appellants.
*1015 Sheldon J. Schlesinger, Robert W. Kelley, and John J. Uustal of Sheldon J. Schlesinger, P.A., Fort Lauderdale, and Arnold R. Ginsberg of Ginsberg & Schwartz, Miami, for appellees-Robert J. McGee, individually, Constance McGee, individually, Kelly Amber McGee, a minor, through her parents and natural guardians, Robert J. McGee and Constance McGee, and Robert J. McGee and Constance McGee, as Personal Representatives of the Estate of Shane McGee, deceased.
GROSS, J.
This products liability case arises from a lengthy trial where the plaintiffs recovered a substantial verdict in compensatory damages and the jury declined to award punitive damages.
We affirm. The trial was marred by the behavior of the attorneys on both sides. Nonetheless, the trial judge guided the trial to its conclusion with a steady, even hand.

The Accident and Plaintiffs' Injuries
On July 3, 1991, Robert and Connie McGee were on vacation in Virginia with their children, eleven-year-old Kelly and thirteen-year-old Shane. The family were passengers in a 1983 Oldsmobile Cutlass Cruiser station wagon owned by a family member, Jane Renze, who was also in the car. The Oldsmobile[1] stopped at a toll booth near Virginia Beach.
Meanwhile, Curtis Cayton was driving his pick-up truck pulling a homemade trailer. The trailer disconnected from the truck, crossed four lanes of traffic, and hit the Oldsmobile. Kelly felt "a little bump." Robert felt a bump, like "somebody had just not quite stopped, pulled up and tapped us." Connie felt a "slight tap." Jane Renze described the accident as "not an impact situation," more like a "thud" as though the car had been hit by a stone.[2],[3]
The trailer tongue pierced the station wagon's gas tank, causing the tank to leak fuel, ignite, and explode. The car was a big ball of fire. Robert, Connie, and Kelly made it out of the car, although all three suffered severe burns. Sitting in the front of the car, Shane was restrained by his seat belt, so he had more difficulty escaping.
When Shane got out of the car, his hair was on fire and his skin was black. Most of his recognizable facial features had been burned away; only his braces were identifiable.[4] His clothes had burned off. *1016 Streaming blood came from his mouth. His eyes were red with blood. Hindered by their own injuries and restrained by others, Robert and Connie were unable to help or comfort their son.
Emergency personnel helicoptered Shane to a Norfolk hospital with burn treatment facilities. By the time he arrived, Shane was alert, with full thickness burns on 98% of his body.[5] A full thickness burn is one that penetrates through all of the skin layers and requires skin grafts in order to heal. The treating physician described Shane's injuries as "the single worst burn [that he had] ever seen in a surviving patient." He told Shane that he was going to die. Shane signaled that he understood by shaking his head, because his eyes were sealed shut from the burns and his vocal cords were scorched. The emergency staff tried to make Shane comfortable by cutting through his burned skin to relieve pressure on his chest and by giving him morphine. He died two hours after his arrival at the emergency room.[6]
Robert, Connie, and Kelly were initially taken to a Virginia Beach Hospital for treatment. Because of the severity of their burns, they were later transferred to the Norfolk hospital where Shane had died. At the burn unit, Connie and Kelly endured painful debridement treatments in burn tubs. A debridement treatment requires the patient to be immersed in a stainless steel tub full of antiseptic, such as Betadine or Clorox, and to have the blisters covering the burned areas scrubbed off.
Robert and Connie heard Kelly screaming from the pain of her twice-a-day debridement procedures. Both Connie and Kelly required morphine to bear the procedure. Connie's treating physician described the torment of her injuries and treatment as "among the severest pain and constant pain that individuals that I have treated will suffer ... [one] of the most painful forms of injury that a person can sustain."
Robert suffered a burn on his leg and a burn on his hand that required a skin graft. Connie sustained burns on 50% of her body. The burns on her arms, hands, legs, and ankles required skin grafts. Kelly's burns covered 20-24% of her body, involving her face and neck, both legs and both arms. Kelly and Robert stayed in the hospital for two and a half weeks before their release. Because her burns were more severe, Connie was hospitalized for five to six weeks.
Once home, Connie required outpatient surgeries to correct the scar tissue around her mouth, which had sealed the corners of her mouth shut and deformed her facial features. Connie had trouble walking and bending her fingers. She was unable to stand without assistance. She suffered severe itching and had difficulty controlling her body temperature, because sweat and oil glands had been burned away. Circulatory *1017 problems created by the burns caused Connie's mouth and legs to swell. She underwent reconstructive surgery because the scars had started to web her fingers.
Kelly was permanently disfigured from the scarring. She struggled with nightmares and depression and felt embarrassed about her scars. The entire family required psychological counseling to deal with Shane's death and their own painful experience. The emergency room physician and therapist who treated the McGees both needed therapy to cope with their exposure to the family's suffering.
The McGees settled their cases with the truck driver, Cayton. They pursued a case against GM on the theories of negligence and products liability. They sought punitive damages on the ground that GM had "actual knowledge" that it had marketed "an inherently dangerous automobile." Chrysler Corp. v. Wolmer, 499 So.2d 823, 826 (Fla.1986). The McGees contended that GM had willfully, intentionally, and unnecessarily exposed them and the American public to death by fire, for monetary reasons. They argued that GM did not provide adequate safety measures on fuel systems because the fire-related deaths did not cost the company enough per vehicle to justify any added expense for safety.

The Plaintiffs' Case for Liability

John Marcosky
John Marcosky, a former GM engineer, testified that the placement of the fuel tank between the rear axle and bumper made the tank vulnerable to breach and puncture, because there was nothing between the tank and the bumper to insulate the tank from rear impacts. He opined that the vehicle was "defectively manufactured and designed at the time of the accident and at the time it left the factory." Describing the placement of the tank close to the ground, he said that the "defect just jumps out at you."
Based on his examination of the Oldsmobile after the accident, Marcosky concluded that the car design was defective because the tank materials, the absence of a shield, and the tank location made the tank vulnerable to direct impacts, fuel leakage, and fire. Marcosky told the jury that the gas tank was made of steel .024 inches thick and opined that the thin material contributed to the tank's breach. He noted that the trailer coupler in the accident struck the metal fuel tank straps, which were made of 1/16 of an inch thick steel and which deflected the impact and avoided puncture of the tank.
According to Marcosky, GM was aware of the fuel tank's design hazards. The design flaw derived from GM's inability to get the size of gas tank they wanted while keeping the floor height in the station wagon at a certain level. Marcosky said that several people had identified the dangers of the fuel tank's placement and that rear impact collision and ground clearance tests raised "red flag" warnings that the fuel tank was vulnerable to puncture. Tests "revealed the fuel tank [involved in this case] was compromised in rear end impact testing, and breached and fuel discharged." Other tests resulted in scraping of the tank from six and eight inch curbs; Marcosky said that these test results were a "red flag that [said] a failure mode for this particular tank should be investigated.... [I]f the vehicle is contacted under these of the lightest possible conditions, what else is there, what else should we consider?"
Marcosky informed the jury that if a car maker decides to "stick with a bad design" and put the tank in a vulnerable spot, then the manufacturer needs to "reduce the hazard and risk of injury" by putting a "band-aid on it." He noted that GM considered *1018 different alternatives to protect the fuel tank from punctures, such as liners, bladders, and shields, with costs ranging from $3.87 to $15.00 per fuel tank. Marcosky conceded that some of the solutions considered had difficulties, such as the problem with sealing a liner or a bladder inside the fuel tank. However, GM considered liners technologically feasible and discussed introducing liners in the A body car as of 1983, but was discouraged by the cost of the change.
Marcosky testified that shielding the tank was the answer to the design problems he observed. Shields were economically and technically feasible when the car was built. Marcosky testified that based on the state of the art in 1982-83, if a shield had been used, the tank would not have been breached in the accident. Shielding would not have cured the ground clearance problem, but the potential to breach the fuel tank would have been "eliminated." The cost of placing a shield on a 1983 Oldsmobile station wagon would have been no more than "a couple of dollars."

Marcosky's Crash Test
Central to Marcosky's opinion that a shield would have prevented the breaching of the fuel tank and the ensuing fire was a crash test demonstration that he designed. Marcosky ordered the fabrication of a steel shield .068 of an inch thick. This shield could have been manufactured by GM at the time the subject car was made.
To test the shield, Marcosky designed a crash test in which the back end of a 1983 Oldsmobile station wagon with the shield in place over the fuel tank was struck by a trailer and coupler at thirty miles per hour, a speed greater than that of Cayton's trailer at the time of impact.
GM raised an authentication objection to the videotape of the test, complaining that there would be no one in court to testify as to how the test was actually set up and conducted. Marcosky was not present when the test was run.
Marcosky had never been involved with crash testing while working at GM. He did not prepare a written work order for the test in this case. Marcosky told the plaintiffs' attorney "the way [he] wanted it done"; he "assumed that whoever [he] was talking to would write it down." Marcosky recalled speaking to plaintiffs' attorney John Uustal about how the tests should be run. He told Uustal that (1) the test should be run at thirty miles per hour, faster than the estimated speed of the trailer in the actual accident; (2) he "wanted the trailer coupler to impact the fuel tank at as close to the location on the test vehicle as could be located on the subject vehicle;" and (3) he "wanted the approach angle to be as close as could be with respect to the reconstruction." Marcosky outlined for Uustal the methodology to accomplish the test using a shoe inserted into a double channel track, a trailer that could be disconnected prior to impact, the designed shield put in place, the gas tank filled to capacity, the car loaded to the test weight of the accident, and a radar gun to verify the speed of impact. The fuel tank used in the test was "exactly the same as that installed in the vehicle at the time of the accident."
Although he was not present when the test was run, Marcosky testified that he knew that the test had been run to his specifications from watching the video, the shape of the shield and tank after the test was performed, and measurements he took at the test site. He also said "apparently there is also somebody who will testify about the speed of the impact."[7] He did *1019 not speak directly to the persons performing the crash test.
Acknowledging that the testing procedure "could have been done better," the court overruled GM's objections to the test. The judge observed that GM's objections to the test were proper subjects for cross-examination, rather than a reason for excluding testimony regarding the crash test and the videotape.
Marcosky used the videotape to support his opinion that a shield would have prevented the accident in this case. Marcosky told the jury:
The result [of the test] was that the impact was at 30 miles an hour, that the coupler did impact the fuel tank at about the same location [as in the accident in this case]; it put a nice score mark in the shield and consequently another little mark deformation into the tank, but the most important part is at 30 miles an hour, no rupture of the tank .... [T]he kinetic energy during the test I designed has almost four times the kinetic energy as experienced during the impact [in this case] .... I wanted to really make sure that this shield that we had manufactured and put in place was going to protect this tank. So I used the federal number of 30 miles an hour and had that test performed, and [the shield] performed very, very well. No puncture of the tank, nice score mark, of course, in the shield .... [W]e learned that the shield protected the tank from being intruded and breaching the lower surface and causing fuel to escape .... [D]eformation of the [test] tank as a result of the trailer coupler hitting the shield deforms the tank inward, but it didn't rupture it, it didn't cut it. The energy, instead, was absorbed by the tank, it deformed it and ... that's what it's supposed to do. But it did not invade, compromise, rupture, breach the bottom surface of this tank.
The jury viewed the tape at least seven times on three different days.

Ronald Elwell
The McGees' second crucial liability witness was Ronald Elwell, an engineer who worked at GM for thirty years, until August 1, 1989. For sixteen or seventeen years at GM, Elwell's "particular expertise or focus" was post-collision fuel fed fires. He was given the task of reducing fuel fed fires by an executive who told him that incidents of fire had to be reduced and that fire reduction would be a major issue in the 1970's and 80's because of scrutiny from the federal government. To become familiar with fuel fed fires, Elwell burned cars, burned fuels, experimented with gasoline, read literature in the field, and investigated approximately 600 to 800 post-collision car fires. On behalf of GM, Elwell testified twenty-two times in court as an expert on fuel system safety issues. GM produced him for deposition as an expert over eighty times.
During his time at GM, Elwell unsuccessfully proposed an engineering standard for fuel system performance that "impact forces below the threshold level of fatality should be free from the hazard of post collision fires"; in other words, if "people survive the accident, there is no excuse for having a fire which will then burn them alive." Elwell testified that even though such a standard was technologically and economically feasible by 1972, GM did not adopt it. Instead, GM chose *1020 to limit its safety standards to the minimum required by the federal government. According to Elwell, Roger Smith, the chairman of the board, told GM engineers not to spend "one penny more" on safety than needed to meet the minimum federal standards.[8]
By 1974, GM's leading fuel systems engineers knew that the federal standard "was inadequate for safety with respect to fuel systems." As early as 1977, GM was aware of a problem with fuel tank punctures in the 1978 A car. At that time, there had been incidents where the differential had broken during rear impact and torn a hole in the gas tank, draining it in seconds. GM began looking at bladders and shields as soon as it was found that the 1978 A car was leaking under testing. Jack Ridenour, a GM automobile safety engineer, told Elwell that shielding the fuel tank, even at $4.50 a car, was too expensive.
By 1981, Mike Barcelow, the release engineer for the 1978 A car, was aware that the vehicle's gas tank was leaking under testing at the minimal federal safety standards. Although GM engineers were looking at ways to solve the problem, they were constrained by the refusal of GM's management to spend a penny more than was necessary to meet the federal standards. According to Elwell, Oldsmobile continued to make the 1978 A car and sell it to the public knowing, "by their own definition, that it was unsafe."
Elwell agreed with Marcosky that the fuel system design here at issue was a "dangerous condition unreasonably dangerous to the consumer who would use the vehicle." The gas tank's location was in the "car's crush zone" and so low to the ground as to make it vulnerable to rear end impact. GM did not put the fuel tank over the rear axle, because it would have prevented designers from accommodating "all of the seating arrangement packages"; the designers said that without more room for full size occupants, the "marketing of the product and the salability of the product would be affected." Elwell explained that GM had enough data to know that an over-the-axle fuel tank location was safer, because cars built that way, such as the Avanti, Ford Capri, and the Subaru, had experienced no fires.
Elwell characterized the rip in the fuel tank in this case as occurring in a low speed accident, because the fuel tank strap was pushed aside, rather than severed, and because the fuel tank had bent inward. He testified that it was foreseeable that an object such as a trailer coupler could strike a fuel tank, because it had happened four times while he was working at GM.[9] He opined that a shield would have prevented the fire in this case because it would have deflected the impact.
*1021 As to GM's efforts to conceal defects in their products, Elwell claimed that GM would use outside firms to run crash tests at the instruction of its attorneys, so that the results of the tests would be protected under the attorney-client privilege. Sometimes, GM would run its own crash tests; but if the results were detrimental to the interests of the corporation, no report was prepared, so no document was available for disclosure in litigation.

Elwell and the Ivey Report
Elwell discussed his discovery of the Ivey Report, a document central to much of the controversy on this appeal.
The Ivey Report was a 1973 memo prepared by Edward Ivey, a GM engineer, entitled "Value Analysis of Auto Fuel Fed Fire Related Fatalities." The document estimated a maximum of 500 fatalities a year in post-collision fuel fed fires; it assigned a value to each fatality of $200,000. Using an estimate of 41,000,000 GM vehicles on the road, the report concluded that "fatalities related to accidents with fuel fed fires [were] costing General Motors $2.40 per automobile in current operation." The report also stated that "it would be worth approximately $2.20 per new model auto to prevent a fuel fed fire in all accidents." The report cautioned that it was "really impossible to put a value on human life" and that it was "impossible to design an automobile where fuel fed fires can be prevented in all accidents unless the automobile has a non-flammable fuel."
During the trial the McGees offered evidence that GM management authorized the Ivey Report to know how much they could spend on fuel systems. GM contended that the report was an unauthorized intellectual exercise by Ivey, a very junior employee, which was not attributable to GM, which no one in management saw, and which did not play any part in the corporation's design decisions.[10]
Elwell first saw the Ivey Report in 1980 or 1981, when it appeared on his desk one morning in a plain brown wrapper. When he read it, Elwell was "shocked and concerned about [having] committed perjury." In his representative capacity, Elwell had been asked in various lawsuits whether GM had ever done a statistical analysis "which based its findings upon the cost of a human life." At GM's direction, Elwell had always replied "No."
When Elwell first saw it, the Ivey Report had a cover page with a two column distribution list, which included Jack Ridenour, safety engineer, Bob Stempel, assistant chief engineer, and other members of top Oldsmobile management. The cover page contained a caption reading, "in response to your request for the following information." Elwell interpreted the memo as concluding that "it was not economically to the advantage of General Motors to step up to that shield," as Ridenour had told him.
In 1982, Elwell spoke to Ivey about the report. Ivey told him that he was assigned to do the value analysis by his direct supervisor, a Mr. Perkins, "to find out what the monies involved would be if *1022 they were to eliminate all post collision fuel fed fires in GM designed vehicles." Ivey explained to Elwell that the $200,000 figure in the report came from the national insurance council, and was not a cost to GM, but was a "societal loss of income that could be attributed to a person who was fatally injured in the prime of life." Elwell indicated that the package containing the Ivey Report was sent to him by Karl Thelan, the acting safety engineer for Oldsmobile, who found the document in Ridenour's desk after he retired.

Videotape Deposition of Edward Ivey
The McGees offered a videotape deposition of Edward Ivey, during which he minimized the importance of the Ivey Report. He did not recall who, if anyone, assigned him to do the memo and he did not believe that the analysis was distributed to anyone. He claimed that he had "never met Ron Elwell in any capacity." Ivey testified, "I don't recall anyone asking me to write this report, and I don't believe anyone did." He did not know why he wrote the report. He never showed the report to Jack Ridenour; he never discussed it with Paul Mutty. In the years since the report was written, Ivey never spoke with anyone to ask them if they had received a copy. He admitted that he had prepared an affidavit in the Moseley[11] case, involving a pick-up truck, in which he stated that the value analysis was conducted to study the performance of passenger cars in rear impacts and that it had nothing to do with trucks.
Ivey participated in a junkyard study in 1973 with Paul Mutty and Jack Ridenour. The purpose of the study was to look at cars that had been in rear-end collisions to see how the location of the fuel tank had affected its performance. Another of Ivey's projects was to analyze the fuel fed fire litigation pending against GM in the summer of 1973 to see if information from those lawsuits would have any bearing on future designs for fuel tank location. In ten lawsuits where the fuel tank had been located behind the rear axle, Ivey concluded that if a fuel tank is in "the lowest part of the car, you're subject to some road hazard damage." In five of the lawsuits the impact had been so severe that the fuel system could not be expected to survive under any circumstances.

The Mid-Trial Discovery Order and Documents 210, 213, and 225
To resolve some outstanding discovery motions, the McGees called Glenn Jackson to testify on February 5, 1998, over two months after the voir dire had begun. Jackson was a GM attorney who was the case manager for this case. Part of his duties were the "facilitation of discovery responses [and] searching for and providing documents in response to requests for production."
To understand what transpired on February 5 with attorney Jackson, it is necessary to place that day in the context of the McGees' attempts to secure documents pertaining to the Ivey Report during discovery.
During the 1980's, GM was a defendant in a number of fuel fed fire cases in which Ivey was a witness. The trial court found:
Ivey testified for seven years, from his first deposition in 1984 until 1991, that he had no recollection about the Ivey Report, and he could not recall who asked him to prepare it or why it was prepared. Then, in 1991, in the case of Moseley v. General Motors which involved a fuel fed fire in a GM pick up truck involved in a side-impact, Ivey signed an affidavit which had been prepared for him by General Motors' legal *1023 staff. In his affidavit, Ivey now recalled that the Ivey Report had nothing to do with pick up trucks in side impacts, but instead was related to passenger cars in rear impacts.
In May, 1997, the McGees propounded interrogatory 4(p) asking if there were "any other documents" related to the Ivey Report "which pertain to the subject matter" of the Ivey Report. In July and August, 1997, GM filed answers to the interrogatory stating that there were no such documents. In September, 1997, GM sua sponte revised its answer to state: "General Motors is not aware of any documents which specifically pertain to the document."
From an outside source, the McGees learned that GM's responses to interrogatory 4(p) were untrue. Several documents relating to the Ivey memo had been listed on the privilege log GM had submitted in a case pending in North Carolina, Cameron v. General Motors, 158 F.R.D. 581 (D.S.C. 1994), vacated in part, In re General Motors Corp., No. 94-2435, 1995 WL 940063 (4th Cir. Feb.17, 1995), litigation involving a post-collision fuel fed fire. The trial judge ordered GM to furnish the plaintiffs all non-privileged documents produced in Cameron and to file with the court under seal all documents for which it claimed a privilege. While preparing to move for protective orders as to a number of documents, GM furnished some documents from the Cameron case to the McGees.
Shortly thereafter, GM realized that it had inadvertently given two documents, identified as Documents 33 and 233,[12] to the McGees. Document 233 was an attempt by a GM attorney "to summarize all of the documents they had reviewed on a particular topic." Baker v. Gen. Motors Corp., 197 F.R.D. 376, 383 (W.D.Mo.1999), order quashed, 209 F.3d 1051 (8th Cir. 2000). GM filed an emergency motion to invoke the attorney-client privilege as to these documents. The trial court determined that document 233 was subject to the privilege and that GM had mistakenly produced it. The court ordered the plaintiffs to return all copies of the document and precluded them from using it in any way during the litigation.
Now suspicious that GM was concealing documents, the plaintiffs subpoenaed GM's outside counsel, in-house counsel, and document custodian to produce a number of documents that had been listed on the privilege log in Cameron, as well as documents and materials pertaining to the Ivey memo. All three men filed affidavits saying that they did not have control or possession of any of the documents requested in the subpoena. GM filed a number of defensive motions directed at this aspect of the discovery.
This discovery matter was not heard until February 5, 1998. GM's in-house counsel, Glenn Jackson, testified outside the presence of the jury. He did not bring any of the subpoenaed documents with him. He said that he looked around his office and "nearby his office" and determined that he did not have any documents responsive to the subpoena served upon him. He interpreted the subpoena as being served upon him personally, and not on behalf of the corporation. He explained that GM retained possession of those documents *1024 and the company had refused to give him access to them.
To say that the trial judge was disturbed by GM's conduct is an understatement.[13],[14] The court ordered production for an in camera inspection on February 9. After reviewing the documents in camera, the judge concluded that since Ivey's credibility was an important issue in the case, Documents 210, 213, 217, 140, and 225 listed on the privilege log in the Cameron case were relevant to Ivey's testimony.
Document 210 consisted of a memorandum from a November, 1981 meeting with Ivey, prepared by Don Howard, outside counsel for GM.[15] Contrary to Ivey's deposition testimony, Document 210 supported the plaintiffs' version of the genesis of the Ivey memo; it indicated that Ivey had a detailed recollection of the cost benefit analysis, that it was prepared at GM's direction based upon information supplied by GM employees, and that, upon completion, the report was disseminated to GM management. The "analysis resulted from his review of information supplied to him by Ron Elwell during his visit to Engineering Analysis where, in addition to the *1025 specific case files, he was provided with various studies by outside entities of automotive fires and death in automobile accidents attributed to fire." Document 210 reported that Ivey characterized "the nature of his analysis submitted to [Oldsmobile management] as one to assist them in `trying to figure out how much Olds could spend on fuel systems.'" According to Document 210, Ivey was:
somewhat reluctant to state that he had assigned a value to human life in the study and stated that he believes that value came from one of the reports he had been supplied by Elwell and that he did not arbitrarily assign such a value. He agreed that he did not like the sound of such a study and admitted that they were very cautious with distribution of the copies due to the nature of the subject. In any event, he took the value and averaged it over the number of GM vehicles on the road and arrived at the cost figure reported in the memo.
Factual information contained in Document 210 thus supported Elwell's version of the Ivey Report and contradicted Ivey's recollection of it as contained in the deposition that was published to the jury.
Document 213 consisted of handwritten notes prepared by GM staff lawyer William Kemp during an August, 1983 interview with Ivey. The notes demonstrated that Ivey had good recollection of the purpose, direction, and distribution of the Ivey report. The court concluded that it was relevant to show "`knowledge' on the part of" GM.
Document 225 was a letter from GM's outside counsel to Ivey during the case of Moseley v. General Motors. The letter explained to Ivey that GM wanted to defeat the attempt to depose Ivey by submitting an affidavit from Ivey stating that his "value analysis was performed years before the subject truck was manufactured and, in any event, had nothing to do with pickup trucks."
Judge Franza found that GM's responses to interrogatory 4(p) "were inaccurate" because documents 210, 213, 217, 140, and 225 pertained to "`the subject matter' of the Ivey Report." The court ruled that document 210 "contradicts the testimony given in this Court by Mr. Ivey and supports the testimony given by Mr. Elwell," the plaintiffs' expert. The court held that documents 213 and 217 were relevant to the Ivey report and showed "`knowledge' on the part of" GM.
Judge Franza ruled that no privilege applied to the five documents referenced above. He cited GM's failure to comply with the text of Florida Rule of Civil Procedure 1.280(b)(5). Although the judge's order referred to "Fla. R. Civ. P. 1.280(b)(4)(d)," it quoted the text of Rule 1.280(b)(5). The judge was also concerned that the documents so sharply contradicted "the answers to interrogatories and testimony of Mr. Ivey that General Motors has produced in this case." The court wrote that it would not
as suggested by Counsel for General Motors, simply forget about these documents and continue on with this trial as though they don't exist. This Court still adheres to the belief that: "We who labor here seek only truth."
The court released documents 210, 213, 217, 225, and 140 to the plaintiffs for use at trial. The court decided that twelve other documents were privileged and returned them to GM.

GM Attorney Glenn Jackson's Testimony
The McGees called Jackson as a witness on February 17. Jackson told the jury that, because of GM's size, answering interrogatories was a complex process. Over objection, Jackson admitted that he *1026 was asked to bring documents from the Cameron case to court. He acknowledged that the same paralegal who helped prepare answers to interrogatories in this case had participated in the Cameron case. He could not explain why GM had produced different documents in the two cases if the same people had worked on both cases.
Over objection, Jackson testified that he had sent the subpoena he received to his supervisor, who interpreted the subpoena as being personally served on Jackson and not the corporation. The supervisor informed Jackson that "those documents were they to exist in the corporation were not to be provided" and that Jackson was to come to Fort Lauderdale and "respond the best way [he] knew how to the subpoena."[16]
Through Jackson, the McGees published Document 210 to the jury. The judge instructed plaintiffs' attorney not to tell the jury that he had ordered production of the document. The judge sustained GM's objections to a number of questions, such as whether the president's counsel wanted document 210 to be kept privileged, whether the document contradicted Ivey's testimony (or supported Elwell's), and concerning expert opinions. When asked whether he agreed with the assessment in Document 210 that Ivey's testimony and value analysis was damaging to GM, Jackson explained that the memo was the opinion of a "young attorney," which was "obviously not an opinion that General Motors has accepted or utilized since Mr. Ivey has been produced and his documents have been produced." Jackson explained GM's answers to interrogatory 4(p) by pointing out that the documents were protected by the attorney-client privilege, and that "[i]t never occurred to me or to anyone else preparing responses to discovery that attorney/client privileged documents ... would be subject to this interrogatory."
The McGees asked Jackson whether the lawyers who had drafted an affidavit in Moseley v. General Motors, which tied the value analysis in the Ivey Report to passenger cars, had also attended Ivey's depositions where he had said he could not recall why he wrote the memo. The McGees asked if GM lawyers let Ivey commit perjury at various depositions. The court sustained GM's objection, but denied a motion for mistrial.
The McGees explored GM's lengthy answers to an interrogatory which asked whether GM "ever considered or evaluated placing a shield around the fuel tank or on the subject station wagon or any other vehicle." Initially, the judge instructed the plaintiffs that they could not ask questions that revealed that GM was ordered to provide better answers to the interrogatory. The judge pointed out that discovery disputes were irrelevant and that GM was entitled to object and assert other defenses to questions.
However, after Jackson testified that GM volunteered supplemental information regarding the shield issue, the judge sua sponte informed the plaintiffs that he would allow questions concerning the court's orders requiring better answers, because Jackson's testimony had opened the door. Thereafter, over GM's objection, the plaintiffs asked Jackson if he had been court ordered to provide better answers.

GM's Defense Case
GM presented the testimony of its engineers, Paul Mutty, Michael Barcelow, William Cichowski, and Jack Ridenour that *1027 the fuel tank location behind the rear axle was a safe design because it kept the fuel tank away from the passenger compartment and allowed room for the tank to deform without tearing.[17]

Paul Mutty
Mutty had recently retired from GM as chief engineer. He was the release engineer on the 1971-75 A car and was responsible for decisions regarding: (1) the thickness of the steel that comprised the 1983 station wagon fuel tank and (2) the need, from a safety standpoint, of such devices as a shield, liner, or bladder in the 1979-83 A station wagon.
Mutty testified that there was no place for an over-the-axle tank in a station wagon with a flat load floor. He said that a rear underfloor tank performs well in rear impacts and can deform greatly without tearing. In 1974, Mutty conducted a series of six tests to compare over-the-axle and underfloor tanks; they performed roughly equivalent in a fifty miles per hour crash. Over the plaintiffs' objection, Mutty played and discussed a videotape of the 1974 test. He showed a video of a fifty miles per hour car-to-car test with a 50% offset on the A car with an underfloor tank; there was no leak in the tank and there was no shield.
Mutty devoted a lot of time trying to figure out "how to make the tank more puncture resistant without causing it to deteriorate in terms of performance on impacts." He was afraid that a shield "might become an unfriendly environment for the tank and itself make a hole in the tank." In trying to come up with a shield, he never felt like he had the right answer. He was more concerned about tank flexibility than puncture resistance, because rear impacts were more common than punctures. He did not want to sacrifice performance in rear end impacts. Mutty admitted that nothing ended up being done "in production" to address his concern about punctures from roadside hazards, although a lot of areas were explored.
Mutty ran a crash test with a plastic tub shield around the gas tank. The shield caused an unusual deformation in the bottom of the tank resulting in a leak; he concluded that the bathtub shield changed the characteristics of the tank and its ability to deform under pressure. On cross-examination, Mutty admitted that the tester who ran the test with the bathtub shield believed that the shield did not cause the tank's unusual deformation; even though he was not present for the test, Mutty said he thought the tester was dead wrong. Mutty did not use the skid plates from off-road vehicles in his designs, because those plates were intended to protect against off-road hazards that passenger vehicles did not encounter.
Mutty first saw the Ivey Report in the mid-1980's in connection with a lawsuit. He never used the document in connection with fuel system design. He denied that management had ever imposed a policy to limit spending on fuel systems to $2.40 a car.

Mike Barcelow
Barcelow was a test engineer for fuel systems in 1975. He became the fuel system release engineer for the 1978 A car, responsible for the brakes and the fuel line. Another release engineer was responsible for the tank.
To rebut the plaintiffs' experts, Barcelow described a tank location study he conducted using three non-GM cars with *1028 different tank locations. The study concluded that "by tailoring vehicle structure to fuel tank location, comparable crash test performance can be obtained with all three of the tank locations investigated." After a junkyard survey, Barcelow concluded that GM A cars "were performing very well in the field ... [t]he bodies were crushing, absorbing a lot of energy, the fuel tanks looked like they were in pretty good shape after the wrecks." From testing, he concluded that an over-the-axle position would make it difficult to protect the tank.
In mid-1978, Barcelow participated in a fuel system improvement project to increase safety. The study considered various designs: a plastic tub enclosure, a steel tank with a molded liner, and a metal tub around a plastic tank. He played a videotape of a crash test conducted with a plastic tub. A still of the tank after the crash displayed a "significant amount of folding in the tank." Barcelow concluded that the cause of the folds was that the tub restrained the tank so that it did not crush in a normal manner. The folding caused a leak. Barcelow compared the results to tests run on unshielded cars where there had been no leakage. Based on this test GM concluded that putting a tub around the fuel tank "did not look like a good idea" and that time would be better spent looking into developing rigid liners and flexible bladders. Both liners and bladders presented design problems that GM was unable to overcome for the A car.
Barcelow denied telling Elwell that a shield was necessary on the A wagon tank.

Jack Ridenour
Ridenour went to work for GM's automotive safety division in 1965. The more he studied the gas tank location issue, the more he concluded that the "flat rear fill tank underfloor" position was the best location. Although engineers considered an over-the-axle tank, by 1973 they rejected it because it might invade the passenger compartment. Also, they recognized that such a tank would not fit into a station wagon.
Ridenour denied ever being ordered by management to limit costs on fuel system safety. He never told Elwell that there was not enough money in the product to include a fuel tank shield. He denied ever seeing the Ivey Report. He stated that no decisions were ever based on the document. Ridenour concurred with Barcelow's conclusions about alternative gas tank designs, such as bladders, coated tanks, plastic tanks, and heavier tanks. He felt that GM's fuel tanks were the best on the market, the state of the art.
Ridenour testified that other aspects of his job during the 1970's included truth-in-advertising, where "anything that went out in advertising ... had to have proof of that in [GM's] files."
On cross-examination, the McGees asked about the situation where GM had used Chevrolet engines in Oldsmobiles instead of the Rocket 88. Ridenour said that he got the truth-in-advertising job right after the engine problem arose.

Deposition of Carl Thelen
GM read a deposition of Carl Thelen, who indicated that he did not find the Ivey Report in Ridenour's desk and that he never sent a copy of the memo to Elwell.

William Cichowski
Cichowski, another engineer, testified consistently with the previous witnesses. He said that skid plates were never considered for passenger cars that were never meant to go off road. He testified that the A wagon met or exceeded internal safety crash test goals. Over objection, he showed the jury videotapes of a thirty miles per hour rear moving barrier crash test. He agreed with the other witnesses *1029 that an eighteen-gallon gas tank could not be located above the rear axle and still maintain the shape of a wagon. The 1983 A wagon tank had a ground clearance of 10 inches; in 1983, the range of ground clearance for state-of-the-art tanks in all cars was from 7.5 to 11 inches.
Cichowski said that the state of the art at the time the 1983 car was manufactured was to place the gas tank in the rear behind the axle. None of the other wagons at the time had shields, liners, or bladders. Given the same circumstances as in this case, the gas tanks of other wagons would have ruptured. He pointed out that this was an unusual accident that was not foreseeable.

Dr. Rose Ray
In addition to the engineer testimony, GM presented statistical evidence from Dr. Rose Ray, over the plaintiffs' objection. In her statistical research, she uncovered only five cases from 1975 through 1996 of rear-end collisions with fire and fatalities in a GM A body station wagon. Dr. Ray noted that the accident ratio translated into one accident per every twenty-six billion miles traveled. She also testified that GM's performance record was comparable to its peers in size and class.

Charles Gauthier
GM called Charles Gauthier, formerly of the National Highway and Traffic Safety Administration. He supported Ray's contention that the A wagon performed well under real world conditions. Gauthier said that his agency never received any complaints about the A wagon and that the A wagon complied with federal safety standards. He said that the 1983 Cutlass Cruiser station wagon complied with Motor Vehicle Safety Standard 301, a performance standard that allows manufacturers creativity in meeting the standards, based on eleven crash tests that he observed. He said that the car was not an unreasonable risk on the road.

Mike Holcomb
Accident reconstructionist Mike Holcomb described the circumstances of the accident. He opined that, based on the impact, the speed of the trailer was 27.7 miles per hour. He also opined that the trailer made contact with the fuel tank at a point higher than the bumper because the trailer hitch was arcing upward when it punctured the fuel tank. Holcomb testified that while the overall impact to the car from the trailer was modest, the trailer's impact on the fuel tank was catastrophic, because all of the force was concentrated on the fuel tank. Holcomb opined that a shield would not have prevented the accident.

More Mid-Trial Discovery Issues
Well into GM's defense case, GM's attorney informed the court that GM had discovered an additional document responsive to the court's order relating to the Ivey Report. The document consisted of typed notes from Ivey on June 20, 1973. GM explained that the notes were not produced earlier because they had been erroneously coded into the GM document database. Outside counsel found the document while preparing for a different trial and notified one of the GM lawyers in this case.
Days later, Walter Lancaster took the stand to testify about the circumstances of the notes' discovery. He explained that he represented GM in the case of Barnes v. General Motors and had been sent a box of documents from an outside law firm in Texas. The Ivey notes were in that box. The court ordered Lancaster to return with a photo of the box, to ensure that no other materials were being kept from the McGees.
*1030 By the time Lancaster returned, the McGees discovered that what had been referred to as Document 210 was part of a larger collection of documents that had not been produced in the case. Lancaster admitted that the collection of documents was about an inch to an inch and a half thick and contained several interviews. GM asserted the attorney-client privilege to the content of the collection, now referred to as exhibit 172. In spite of the late discovery, the court refused to strike GM's pleadings, deciding to address the issues through post-verdict motions.

The Verdict
The jury returned a verdict on May 18, 1998, after two days of deliberations. The jury rejected the plaintiffs' request for punitive damages. It decided for the plaintiffs on liability, on negligence and products liability grounds. Answering questions on the verdict form, the jury determined that the driver of the trailer, Curtis Cayton, was negligent. The jury allocated the fault 45% to Cayton, and 55% to GM. The jury awarded Kelly McGee $2 million for past injuries and $5 million for future injuries; Connie McGee was awarded $5 million for past injuries and $10 million for future injuries, $1 million for past loss of consortium, $0 for future loss of consortium, $5 million for past damages from her loss of Shane, and $10 million for future damages for her loss of Shane; Robert was awarded $3 million for past injuries, $2 million for future injuries, $1 million for past loss of consortium, $1 million as to future loss of consortium, $5 million for his past damages from losing Shane and $10 million for his future damages from losing Shane.

Post-Trial Motions
Both sides filed post-trial motions. The McGees moved for a new trial on punitive damages, on the ground that GM had committed discovery violations. They alleged there was a plethora of recently discovered and to-be-discovered documents that supported their claim. The McGees also moved to strike the finding of fault against Cayton, and to enter judgment for 100% of the damages against GM. GM moved for judgment in accordance with the motion for directed verdict, for new trial, and for remittitur.
In a December 29, 1998 order, Judge Franza denied all of the post-trial motions but one. He deferred ruling on the McGees' motion for a new trial on punitive damages pending further discovery. The court ordered GM to produce a number of other documents and to make Ivey available for deposition.
Judge Franza died a short time after the December 29 order. Judge Brescher resumed his duties as presiding judge on the case and held a series of hearings on the discovery abuse issue. After reviewing the documents submitted by GM, Judge Brescher denied the plaintiffs' motion for a new trial on punitive damages. He found that the newly discovered evidence would not have changed the outcome of the jury's verdict on punitive damages. He determined that Document 210 was the most damaging document of all the attorney interview notes; since the jury was able to consider Document 210, Judge Brescher decided that the additional notes would not have led to a different result in the case.

Documents 210, 213, and 225
The most significant issues on this appeal emerged from documents 210, 213, 225, the McGees' fight to obtain them, and GM's effort to shield them.
GM complains that the trial court reversibly erred by allowing the McGees to subpoena Documents 210, 213, and 225, requiring GM to produce these documents, and admitting them into evidence.
*1031 GM reasons that the McGees should not have been allowed to subpoena in-house attorney Glenn Jackson for documents that were in the possession and control of the GM corporation. This argument ignores GM's serial lack of compliance with the rules of discovery.
The plaintiffs were not successful in getting GM to disclose the mere existence of the documents at issue. GM's responses to interrogatory 4(p) stated that it was unaware of any documents which "specifically pertain[ed]" to the Ivey memo. Typical discovery methods, such as requests for production and interrogatories, had not worked. No privilege log was filed. Only when they obtained the privilege log in the Cameron case, did the plaintiffs have the information to pursue further discovery.
Glenn Jackson identified himself as the case manager, indicated that he prepared the corporation's answers to interrogatories, and admitted that part of his job was producing documents in response to interrogatories. When the parties discussed the subpoena to Jackson with the judge on December 15, 1997, well before Jackson's court appearance, GM's attorneys raised the privilege objections but did not alert the court that GM would take the position that Jackson did not have "possession or control" of the documents to produce them for in camera review.
The trial court correctly concluded that it was proper to order Jackson to produce the subpoenaed documents. To accept GM's argument that the court erred because Jackson did not have "possession or control" of the materials would be to allow the corporation to play a shell game with discovery by withdrawing "possession or control" each time the plaintiffs identified the potential custodian of a document.
GM next asserts that the documents were privileged and therefore protected from disclosure.
In order for a communication of a corporate employee such as Ivey to be covered by the attorney-client privilege it must be demonstrated that:
(1) the communication would not have been made but for the contemplation of legal services;
(2) the employee making the communication did so at the direction of his or her corporate superior;
(3) the superior made the request of the employee as part of the corporation's effort to secure legal advice or services;
(4) the content of the communication relates to the legal services being rendered, and the subject matter of the communication is within the scope of the employee's duties;
(5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.
S. Bell Tel. & Tel. Co. v. Deason, 632 So.2d 1377, 1383 (Fla.1994). Attorney-client privileged materials are subject to disclosure only when one of the statutory exceptions, such as the crime fraud exception, applies. See § 90.502(4)(a)-(e), Fla. Stat. (1997); E. Air Lines, Inc. v. U.S. Aviation Underwriters, Inc., 716 So.2d 340, 343 (Fla. 3d DCA 1998).
By contrast, the work product doctrine applies to "materials prepared in anticipation of litigation by or for a party or its representative" and may be discovered, depending on the type of work product, where "the party seeking discovery has need of the material and is unable to obtain the substantial equivalent without undue hardship." S. Bell, 632 So.2d at 1384; see Fla. R. Civ. P. 1.280(b)(3).

*1032 Fact work product traditionally protects that information which relates to the case and is gathered in anticipation of litigation. Opinion work product consists primarily of the attorney's mental impressions, conclusions, opinions, and theories. Whereas fact work product is subject to discovery upon a showing of "need" and "undue hardship," opinion work product generally remains protected from disclosure.
S. Bell, 632 So.2d at 1384 (citations omitted); accord Leventhal v. Lohmann, 721 So.2d 1249, 1250 (Fla. 4th DCA 1998).
Document 210 consisted of notes taken by Don Howard, outside counsel for GM, during a November 3, 1981 interview with Edward Ivey. At the end of the document, attorney Howard recorded his opinion that Ivey's testimony, as well as the value analysis memo, would be damaging to GM in post-collision fuel fed fire litigation. Both Howard's recording of Ivey's statements and his opinions about the import of those statements constituted nondiscoverable opinion work product. See Horning-Keating v. State, 777 So.2d 438, 444 (Fla. 5th DCA 2001); State v. Rabin, 495 So.2d 257, 262 (Fla. 3d DCA 1986); see also Baker v. Gen. Motors Corp., 209 F.3d 1051, 1054 (8th Cir.2000) (observing that "[n]otes and memoranda of an attorney ... from a witness interview are opinion work product entitled to almost absolute immunity"). This is so because the attorney's choice to record certain facts or statements and not others tends to reveal the attorney's opinions, theories, and legal strategies. See Rabin, 495 So.2d at 262; Baker, 209 F.3d at 1054.
For similar reasons, we also find that Document 213, attorney Kemp's notes from an interview with Ivey, to be protected work product.
Document 225 is a letter from GM's outside counsel, Chilton Varner, to Ivey during the Moseley case. The letter explains that GM wanted to defeat an attempt to depose Ivey by submitting an affidavit from Ivey stating that the Ivey Report did not relate to pickup trucks, the type of vehicle at issue in that case. The letter is obviously work product. Also, the attorney-client privilege applies since the letter was a communication between an attorney and the employee of a corporate client on the subject of litigation that was not intended to be disclosed to third persons. Unlike cases where an attorney communicates non-privileged information to the client, such as a trial date or the language of a statute, Varner's letter conveyed the lawyer's pre-trial litigation strategy. Cf. Kilbourne & Sons v. Kilbourne, 677 So.2d 855 (Fla. 1st DCA 1995) (finding non-privileged an attorney letter to a client where the attorney merely recited language from a relevant statute); Watkins v. State, 516 So.2d 1043 (Fla. 1st DCA 1987) (finding non-privileged an attorney letter advising the client of trial dates).
Nonetheless, we find that GM waived the privileges in this case by its failure to comply with Florida Rule of Civil Procedure 1.280(b)(5) which provides:

Claims of Privilege or Protection of Trial Preparation Materials. When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.
The way that a party claims privilege under the rule is to file a privilege log. See TIG Ins. Corp. of Am. v. Johnson, 799 *1033 So.2d 339, 340-41 (Fla. 4th DCA 2001). One purpose of the privilege log is to identify materials which might be subject to a privilege or work product protection so that a court can rule on the "applicability of the privilege or protection" prior to trial.
GM filed a privilege log in the Cameron case. In this case, GM's failure to file a privilege log similar to the Cameron log resulted in substantial disruption of the trial. GM did not assert the privilege until the plaintiffs independently learned of the existence of the documents and tried to obtain them. Under the circumstances of this case, we find that GM's conduct during discovery justifies a finding that GM failed to preserve the privilege with respect to the three documents. See Omega Consulting Group, Inc. v. Templeton, 805 So.2d 1058, 1060 (Fla. 4th DCA 2002); TIG Ins., 799 So.2d at 342; see also Dorf & Stanton Communications, Inc. v. Molson Breweries, 100 F.3d 919, 923 (Fed.Cir. 1996) (observing that a trial court's finding of a waiver of privilege is reviewed under the abuse of discretion standard). Producing a log in the Cameron case does not excuse GM's failure to submit one here. See Nationwide Mut. Fire Ins. Co. v. Hess, 814 So.2d 1240, 1242 (Fla. 5th DCA 2002) (holding that a litigant's failure to file a privilege log waived its privilege claim, even though it had submitted a log in another case filed by the same plaintiff in another county).

GM Received a Fair Trial, but Not a Perfect One
The ultimate question in this case is whether the verdict was produced in a fair proceeding, based on the facts according to the rules of evidence. This is true whether the trial lasts five hours or five months. Based on our careful review of the record, we find that GM received not a perfect trial, but a fair one. See Norman v. Gloria Farms, Inc., 668 So.2d 1016, 1020 (Fla. 4th DCA 1996) (observing that "[w]hile a party is not necessarily entitled to a perfect trial, a party is entitled to a fair one"); Matthews v. State, 772 So.2d 600, 603 (Fla. 5th DCA 2000) (stating that "[i]t is well-established that a defendant is not entitled to a perfect trial, only a fair one"). The jury performed a yeoman task in this case. After months of trial, it resolved diametrically opposed credibility matters while separating the punitive damages issue from that of liability.
GM complains about attorney Robert Kelley's conduct during jury selection and in opening statements. The record reflects that the trial judge sustained many of GM's numerous objections.
During voir dire, Kelley asked the venire, "Do you all understand ... it may be that General Motors does feel responsibility for this, but that they cannot buy my client's silence?" The impropriety of the remark is obvious, since it suggests an admission of liability. The trial judge informed Kelley that the remark was "improper" and instructed the jury to disregard it.
Prior to trial, GM moved in limine to preclude mention during the trial of its discovery abuse. The court recognized that some types of discovery conduct was admissible, such as comparing interrogatory answers to the evidence at trial. The court instructed Kelley: "Before it's mentioned, pass it by me, proffer it so I can rule. If you are going to do this in your opening statement, you better tell me what you want to say ...."
Four days later, during opening statements, Kelley ignored the judge's cautionary admonition. He told the jury that it would "be the very first jury ever in the United States to hear certain evidence about General Motors." The court sustained *1034 GM's objection. Kelly rephrased the statement to: "You will hear evidence that no one else has ever heard before." Again, the court sustained an objection and instructed Kelley to confine himself to what the evidence in this case would show. A few moments later, Kelley said:
There is another issue in this case. It's a corporate coverup, because you will see in this case, not only in this case, but in other cases across the land, Texas, Kentucky, Virginia ... [t]hat General Motors lied in those cases, that General Motors has hidden documents from the American public in those cases .... The evidence will show not only that GM covered up or attempted to cover up pertinent information in this case, and that witnesses have testified falsely on behalf of GM in this case by their own admission now that they've been caught, but you will see from the evidence ... that this is a pattern that has gone on in this country for the past 15 years.
GM objected and pointed out how this argument was in direct contravention of the court's earlier instruction to proffer statements about GM's discovery abuse in other lawsuits. The judge sustained the objection and told Kelley to confine his statements to the testimony given by Ivey in those other cases.
Kelley told the jury that Ivey had lied in depositions in different lawsuits around the country with the help of GM's lawyers. The court sustained three objections to Kelley's story about the "agony" the McGees went through to get an answer to their interrogatory regarding GM's shield testing. Finally, the court sustained an objection to yet another reference to this being the "first jury in the country" to see certain evidence.
After Kelley's opening, GM moved for a mistrial. The judge denied the motion the next day; at the time, he warned that Kelley had been "close" to provoking a mistrial and instructed him to "stay within the bounds of the rules and my orders." We find no abuse of discretion in the trial judge's ruling. As we discuss below, many of Kelley's statements became appropriate on the issue of punitive damages.
After the opening statements, over a month of trial passed, largely without incident.
During Elwell's testimony, GM renewed its objection to general testimony about how GM handled discovery requests during litigation. After much discussion, the judge ruled that Elwell could talk generally about the discovery process. Over objection, Elwell told the jury that "sometimes" GM would run tests; if the results were detrimental to the interests of the corporation, no report was prepared so that it would not have to be disclosed during litigation. Similarly, Elwell said that GM used a testing ground for the car industry, that of Failure Analysis Associates, so that it could conduct experiments yet protect the results by claiming attorney-client privilege.[18] He claimed that after former GM CEO Roger Smith elevated cost considerations over safety, certain studies were conducted "under the umbrella of attorney-client privileged information" so that they did not have to be disclosed to plaintiffs' attorneys.
Kelley wanted Elwell to testify about "GM's practice of giving elusive answers to interrogatories, woodshedding engineers who testified, and incomplete searches of engineering files in response to discovery requests." The court told Kelley that "discovery irregularities" were not a question *1035 for the jury and that he was "treading on very thin ground by even trying it."
On cross-examination by GM's attorney, Elwell described how engineers were routinely "woodshedded by the attorneys" before depositions until they were "ready to mouth the corporate party line." By eliciting this testimony, GM waived any objection to it. Elwell repeated this testimony on redirect examination.
On redirect examination, Elwell pointed out that, when he worked on lawsuits for GM, he had a work load of 546 fire cases, 186 post-collision fires, and 360 non-collision fires. He testified that his work load increased because "discovery abuses" by GM led to big losses in two cases and many lawsuits commenced thereafter. Again, this general reference to discovery abuses was irrelevant; it suggested an improper basis for the jury's decision. GM objected and moved to strike. The court denied the motion.
GM attorney Glenn Jackson was on the stand for over three days. The questioning of Jackson focused on the different interrogatory answers he had provided on behalf of GM in this case; the differences between the discovery production in this case and the Cameron case; Jackson's conduct with regard to document 210; the contents of document 210; affidavits and discovery responses filed by GM in other cases concerning the Ivey report, and the complicity of GM in presenting Ivey's testimony in other cases knowing that the testimony was false.
The vast majority of questions asked of Jackson were relevant to the issue of punitive damages. Once the court made the determination that documents 210, 213, and 225 were admissible, the plaintiffs were entitled to argue their import on the issue of punitive damages, even though GM's version of the facts minimized their significance.
The plaintiffs' contention was that the Ivey report was central to GM decision-making on fuel system safety issues; the memo supports the contention that "it was not economically to the advantage of General Motors" to ameliorate the "unreasonably dangerous" fuel system design at issue in this case. The plaintiffs' presented testimony that GM was aware of the fuel tank's design deficiencies but concealed them. To subordinate human life to corporate profit is reprehensible conduct. The plaintiffs were entitled to argue that GM had concealed the significance of the Ivey report for a number of years. Evidence of "concealment of offensive conduct after it initially occurred is indicative of malice or evil intent sufficient to support punitive damages." Johns-Manville Sales Corp. v. Janssens, 463 So.2d 242, 256 (Fla. 1st DCA 1984), disapproved on other grounds, Chrysler Corp. v. Wolmer, 499 So.2d 823, 826 (Fla.1986); see also Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21-22, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); Orkin Exterminating Co. v. Jeter, 832 So.2d 25, 41-42 (Ala.2001); State v. Moorhead State Univ., 455 N.W.2d 79, 85 (Minn.Ct.App.1990) (defendant's encouragement of witnesses to fabricate testimony and to cover up discrimination sufficient to support award of punitive damages).
In the related context of Title VII litigation, a plaintiff may "establish that the defendant acted with reckless disregard for his federally protected rights by showing that the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions." Bruso v. United Airlines, Inc., 239 F.3d 848, 858 (7th Cir.2001); see also Davis v. Rennie, 264 F.3d 86, 115 (1st Cir.2001) (where court observed that "a punitive damages award may be `justified not only by defendants' actions on [the *1036 date in question] but also by their subsequent behavior'") (quoting Hall v. Ochs, 817 F.2d 920, 927 (1st Cir.1987)); Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 516 (9th Cir. 2000); E.E.O.C. v. Wal-Mart Stores, Inc., 35 Fed. Appx. 543, 545-46, 2002 WL 1003133 (9th Cir.2002); Vasquez v. Atrium, Inc., 2002 WL 818066, at *8 (D.Ct. Ariz.2002).
This case is distinguishable from Amlan, Inc. v. Detroit Diesel Corp., 651 So.2d 701(Fla. 4th DCA 1995), relied upon by GM. In Amlan, we wrote that the general rule is that "[e]vidence related to the history of pretrial discovery conduct should normally not be a matter submitted for the jury's consideration on the issues of liability." Id. at 703 (emphasis added); see also Kawamata Farms, Inc. v. United Agri Prods., 86 Hawai'i 214, 948 P.2d 1055, 1082-84 (1997) (holding that circuit court abused its discretion by instructing jury that it could consider discovery misconduct by a pesticide manufacturer in considering the merits of a products liability case, because "the power to sanction for discovery misconduct is within the exclusive province of the circuit court, not the jury"). Unlike this case, Amlan was not a case involving punitive damages; the plaintiff there sought to used the defendant's discovery abuse to prove the defendant's liability in a case involving breach of contract and fraud.
We agree with GM that two errors occurred during the trial, but we find those errors to be harmless in the context of this case; "after a considered examination of the entire case" it does not appear that the errors "resulted in a miscarriage of justice." § 59.041, Fla. Stat. (2001). The jury was not swept away by the emotions of the attorneys. The jury's verdict separated the issues of liability and damages from that of punitive damages.
Jack Ridenour, a long time GM employee, testified about the Ivey memo and the safety of the S car's fuel tank design. On direct examination, in passing, Ridenour mentioned that one of his job functions in the 1970's included truth in advertising; he said that "in that job anything that went out in advertising ... I had to have proof of that in our files."
During cross-examination, the McGees impeached Ridenour's testimony by asking him whether he worked on the Rocket 88, a car with a special Oldsmobile engine popular in the 1970's. GM suffered embarrassment when it was forced to disclose that regular Chevy engines were placed in Oldsmobiles, but marketed as unique because of the Rocket 88 engine. GM objected to the line of questioning, but the court ruled that the question properly related to Ridenour's credibility. This was error. "The law is well settled that it is improper to litigate purely collateral matters solely for the purpose of impeaching a party or witness." Dempsey v. Shell Oil Co., 589 So.2d 373, 377 (Fla. 4th DCA 1991) (citations omitted).
Ridenour testified that his position with the truth-in-advertising department started just after the Rocket 88 scandal. The McGees asked Ridenour if he knew that forty-one state attorneys brought a class action in order to deal with GM's misrepresentations about the Rocket 88.
The Rocket 88 incident was not one of the permissible modes of impeachment recognized by the evidence code. See § 90.608, Fla. Stat. (2001). A witness cannot be impeached by the prior bad acts of his corporate employer in which he was not involved. Ridenour did not open the door to this testimony by remarking on direct examination that, at one time during his over thirty years at GM, his duties included truth-in-advertising. Nonetheless, *1037 this brief incident did not become a feature of the trial. GM's examination of Ridenour clarified that he did not work with the truth-in-advertising department at the time the Rocket 88 problems arose.
Another error occurred in the cross-examination of GM expert Charles Gauthier, a former staff member of the National Highway Traffic Safety Administration. He opined that the 1983 Cutlass Cruiser complied with Federal Motor Vehicle Safety Standard 301. However, the plaintiffs extensively cross-examined him about an opinion he gave on behalf of a school bus manufacturer in a completely different case. This line of questioning was legally irrelevant. The defect at issue in the other case was not at all similar to the one at issue in this case.
In that case, Gauthier concluded that a handrail was not defective, even though seven children had died as a result of it. He was asked if he knew that the manufacturers volunteered to recall the buses because they were dangerous. Kelley asked Gauthier about the child "dragged to her death" as a result of the handrail, whether the mother of the child killed in the accident would have considered the handrail an unreasonable risk, and whether he remembered the names of any of the children involved in that accident. There was no legitimate evidentiary purpose for even asking these questions.
Another error occurred during the plaintiffs' rebuttal closing argument. GM pointed out that the McGees' expert, John Marcosky, was not present during the crash test about which he testified. Referring to the videotape of the test, GM argued:
Mr. Marcosky wasn't there for that test.... He didn't talk to anybody that was there. He doesn't know what happened. He can't tell you that that tank and that shield or piece of metal came out of this test or some other test or how it got there because there is no documentation.... This is not a test, this is not documented, this is nothing but a veil thrown out to confuse because Marcosky wasn't there, he doesn't know, he didn't ask anybody, and they chose not to bring the four people who actually knew the most about it.
In rebuttal, the McGees' attorney stated, "[GM] know[s] [plaintiff's attorney] John Uustal was there, they know he was at that test. You think John Uustal would do anything improper?" GM objected and further noted that the McGees' attorney was out of time. The court did not respond to the objection, and gave the McGees' attorney a few more minutes to complete his argument.
It is clear error for an attorney to ask the jury to believe him, or his co-counsel, based on his personal credibility. See Davis v. S. Fla. Water Mgmt. Dist., 715 So.2d 996, 999 (Fla. 4th DCA 1998). As this court explained in Davis:
The jury is required to decide a case on the basis of the law and evidence, not on their affinity for or faith in a particular lawyer. While every advocate strives to be trusted and believed, it subverts the jury system to make an overt, personal pitch.
Moreover, a statement of personal belief inevitably suggests that the lawyer has access to off-the-record information, and therefore invites the jury to decide the case on the basis of non-record evidence.
Id.
In this case, the propriety and credibility of Marcosky's crash test was hotly contested and important to the jury's determination of the existence of a design defect. The crash test was central to Marcosky's opinion. A weakness in the plaintiffs' *1038 case was that their attorney had set up the test but no witness present at the test actually testified at trial. GM was entitled to attack this weakness. It was error for the trial court to allow the McGees' attorney to vouch for the honesty of his co-counsel, who had set up the disputed crash test. See Airport Rent-A-Car, Inc. v. Lewis, 701 So.2d 893, 897 (Fla. 4th DCA 1997); S.H. Inv. & Dev. Corp. v. Kincaid, 495 So.2d 768, 772 (Fla. 5th DCA 1986).
Nonetheless, we do not find the brief reference in closing to have tainted the trial in a way that mandates reversal. By that time in the trial, the jury could not have held any of the attorneys in such high regard that their vouching for anyone's credibility could have carried any weight. This trial was far longer than necessary. GM had effectively cross examined Marcosky and argued to the jury about the problems with the crash test. The brief reference in closing did not undermine the entire trial. We have confidence in this case that the jurors were "not potted plants." Grant v. State, 738 So.2d 1020, 1022 (Fla. 4th DCA 1999). We do not believe that, after five months of trial, this isolated comment resulted in a miscarriage of justice.

Videotape of the Marcosky Designed Crash Test
GM attacks Marcosky's reliance on the crash test primarily on two grounds.[19] First, GM argues that the videotape of the test was inadmissible since Marcosky was not present when the test was run. Second, GM argues that the experiment was inadmissible since it was run under circumstances dissimilar from the accident in this case.
Even assuming that the video of the crash test was inadmissible in evidence, Marcosky still could have relied on the test to give his opinion that a shield was the answer to the station wagon's design problems. Section 90.704, Florida Statutes (2001), provides that an expert may base his opinion on "facts or data" that are not admissible in evidence, if "the facts or data are of a type reasonably relied upon by experts." See Casa Linda Tile & Marble Installers, Inc. v. Highlands Place 1981, Ltd., 642 So.2d 766, 768 (Fla. 4th DCA 1994) (holding that architect could testify that the tiles were defectively laid, relying on a lay witness' test of the tiles, at the architect's instructions, to determine the number of tiles that sounded "hollow"). It was established at trial that automotive engineers rely on crash tests run by third parties to form their opinions, without the expert being present to set up or observe the actual test. GM introduced videotapes of crash tests through three engineers with less of a foundation than the McGees established in introducing Marcosky's test. For example, to establish the foundation for introducing a videotape of a 1974 crash test, GM's former chief engineer testified:
I would say hey, J.P. Miller [the test engineer], I'd like to have a crash test, and then describe it. And he would take that information, write up a form that's normally included with the report, submit that to the test facility, they would run the test and then report.
We find no error in the trial court's conclusion that the crash test was sufficiently *1039 similar to the Virginia crash to be admissible in evidence. As the supreme court has observed, the strict "rule of `essential similarity' between test conditions and actual conditions first enunciated in Hisler v. State, 52 Fla. 30, 42 So. 692 (1906), has been eroded as to other types of experimental evidence since that time." Johnson v. State, 442 So.2d 193, 196 (Fla. 1984). "[T]he issue is one of the weight to be given the evidence rather than its relevance or materiality." Id. As the third district has observed, since
very few tests can be made under the exact conditions present when a prior event occurred[,] the law requires only that substantially the same conditions must exist, and the trial court is allowed considerable latitude in determining whether the conditions are sufficiently similar to permit testimony about the tests.
Rindfleisch v. Carnival Cruise Lines, Inc., 498 So.2d 488, 493 (Fla. 3d DCA 1986).
Finally, although the question is a close one, we find no abuse of discretion in the trial judge's determination that the test was sufficiently authenticated by Marcosky's testimony that he could tell that the tests had been run to his specifications from watching the video, from the shape of the shield and tank after the test was performed, and from measurements that he took at the test site. For example, Marcosky said that the video demonstrated that "the test unfold[ed] in the manner in which [he] intended." Marcosky was on the witness stand for cross-examination from January 6 through 15; GM had an extensive opportunity to explore the validity of the test. GM did not effectively cross-examine Marcosky on his claim that he could determine from the videotape that the test had been run to his specifications.

The Amount of the Damage Awards
GM argues that the damage awards in this case were grossly excessive as a matter of law. We disagree. This panel has over sixty years of combined judicial experience. These injuries, and the suffering they caused were extraordinary, among the worst that this panel has ever encountered. The verdict was not "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." Bould v. Touchette, 349 So.2d 1181, 1184 (Fla.1977); Winner v. Sharp, 43 So.2d 634, 637 (Fla.1950) (observing that "[t]hose who have not brought a child into the world and loved it and planned for it, and then have it suddenly snatched away from them and killed, can hardly have an adequate idea of the mental pain and anguish that one undergoes from such a tragedy").

Verdict Should Not Be Reduced by the Comparative Fault of Curtis Cayton
On cross-appeal, the McGees argue that the trial court should not have lowered their award based on the comparative fault assigned to Curtis Cayton. We agree.
This case is controlled by D'Amario v. Ford Motor Co., 806 So.2d 424 (Fla.2001). There the supreme court held that "principles of comparative fault concerning apportionment of fault as to the cause of the underlying crash will not ordinarily apply in crashworthiness or enhanced injury cases." Id. at 426. This was the type of case falling within D'Amario. The plaintiffs did not seek recovery for injuries that resulted from the initial collision of the trailer with the Oldsmobile. The evidence was that the initial impact was minor. They alleged that their damages resulted from the defectively designed fuel tank. There was evidence that *1040 this type of accident was one that was foreseeable and that could have been taken into account in the design of the fuel system. In such a case,
the automobile manufacturer is solely responsible for the enhanced injuries to the extent the plaintiff demonstrates the existence of a defective condition and that the defect proximately caused the enhanced injuries. Thus, an automobile manufacturer who allegedly designed a defective product may not be held liable for damages caused by the initial collision and may not apportion its fault with the fault of the driver of the vehicle who caused the initial accident.
Id. at 442.

Document 233 and Other Attorney Notes Are Privileged
We affirm the trial court's finding that Document 233 was privileged. Document 233 consists of a memo from the law firm of Winston & Strawn to GM summarizing documentation relevant to post-collision fuel fed fire litigation. The trial court held that GM had inadvertently produced the document to the McGees, that the document was privileged, and ordered the McGees to return the document. The McGees contest that GM's production of the document was inadvertent.
As the case of Abamar Housing & Development, Inc. v. Lisa Daly Lady Decor, Inc., 698 So.2d 276, 279 (Fla. 3d DCA 1997) explains, courts typically employ a five-part test to determine whether production of a document is inadvertent:
(1) The reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay and measures taken to rectify the disclosures; and (5) whether the overriding interests of justice would be served by relieving a party of its error.
In this case, GM asserted the privilege to the documents in question, and only produced the documents in compliance with a court order that all the documents considered non-privileged in Cameron be produced to the McGees. The Fourth Circuit overturned the district court's ruling that Document 233 was non-privileged, a fact unknown to GM's attorneys in the instant case until after the document was disclosed. GM notified the court and the McGees in a timely fashion, within days of its discovery that the document had been erroneously produced. Because the document constituted both opinion work product and attorney-client communication, the erroneous production was prejudicial to GM. Accordingly, the trial court did not abuse its discretion in applying the five factors to determine that GM produced Document 233 inadvertently. See Astaldi Constr. Corp. v. M. Held Plumbing Co., 710 So.2d 225 (Fla. 3d DCA 1998) (applying abuse of discretion standard to the trial court's determination of whether production was inadvertent).
Further, unlike the discovery of Documents 210, 213, and 225, Document 233 was made available to the court upon the McGees' request and the privilege was continuously asserted regarding the document throughout the discovery process. Therefore, GM did not waive its privilege with respect to Document 233 by failing to comply with Florida Rule of Civil Procedure 1.280(b)(5).
The attorney notes from undisclosed interviews with Ivey are all privileged documents. The crime fraud exception does not apply to the notes because there was no showing that Ivey sought out any attorney's legal advice for the purpose of furthering a fraud. See § 90.502(4)(a), Fla. *1041 Stat. (1997); Am. Tobacco Co. v. State, 697 So.2d 1249, 1253 (Fla. 4th DCA 1997). Instead, the notes reflect that the attorneys were aware of inconsistencies in Ivey's testimony. An attorney's knowledge of past inconsistent testimony is not enough to invade the attorney client privilege. See First Union Nat'l Bank of Fla. v. Whitener, 715 So.2d 979, 982-83 (Fla. 5th DCA 1998) (holding that attorney's knowledge of past conflict of interest and breach of fiduciary duty "falls short" of "aiding a fraudulent scheme").

Plaintiffs Are Not Entitled to a New Trial on Punitive Damages
The McGees contend that they are entitled to a new trial on punitive damages because the trial court mistakenly treated document 233 as privileged, because new evidence in the form of attorney notes from interviews with Ivey were discovered, and because GM committed discovery violations throughout the trial.
As we have held above, the trial court's ruling on document 233 was not in error and the attorney notes from undisclosed interviews were privileged. We find no abuse of discretion in Judge Brescher's post-trial ruling that even if admissible, the newly discovered evidence would not have changed the outcome on punitive damages.
We affirm in all respects except that the case is reversed in part on the cross-appeal consistent with this opinion.
POLEN, C.J., and WARNER, J., concur.
NOTES
[1] That model was generically known as a 1978 A car. The Oldsmobile division of General Motors was responsible for the development of the fuel system in the car.
[2] In the 1,500 to 1,600 accidents he had investigated, Trooper Kenneth Hicks had "never seen one that happened" like the one in this case. The trooper stated that the accident would have been a minor one if not for the fire.
[3] The plaintiffs' description of the accident differs greatly from the following characterization of it contained in GM's initial brief:

Then, with ½ ton of force behind it, the tongue reared up under that bumper, drove straight into the wagon's gas tank, and tore it.
* * *
Then the tongue, 30 inches long and solid steel, bounced upward and, with ½ ton behind it, drove the coupler handle straight into the back side of the wagon's gas tank at 16-19 miles per houra concentrated, "point load[ed] impact of some 8,600 to 12,000 foot pounds of force, breaking the coupler handle."
[4] Robert testified: "For an instant I just saw him and my heart jumped through my mouth, I thought, my God, he is going to be okay, he is out of the car ... then I saw him, he was on fire and I knew he wasn't going to make it.... He was black, he was just burned. I didn't see any hair, I didn't see any ears. I could see his braces; he had wore braces."
[5] The trial judge sustained GM's objection to photographs of Shane after the accident, ruling that they were too prejudicial.
[6] In recounting the facts in its initial brief, GM wrote: "Gasoline leaked out of the torn full tank, and a spark ignited a fire that engulfed the car. Shane McGee, at first trapped inside, died in the fire." At another point in the initial brief, GM wrote, "[i]n the ensuing fire Shane McGee died ...." These excerpts are obviously not accurate. They are emblematic of the mischaracterizations in the initial brief's thirty-one page "Introduction" and "Statement of the Case." In spite of being the appellant, GM stated the facts argumentatively and drew all inferences in the light most favorable to itself. This approach severely undermined the credibility of the brief. The panel has carefully read the transcripts of the entire trial to understand what happened at trial in this case.
[7] In response to a question from the court, Marcosky indicated that he knew that the trailer was going thirty miles per hour prior to impact because "there was a radar gun that had been projected on the trailer that verified the impact speed." At this point a GM lawyer chimed in: "There was a witness for that, judge," indicating that GM did not dispute the existence of such a radar reading.
[8] On cross-examination, Elwell expressed his concern about the Roger Smith edict to not spend one cent more than necessary to comply with the minimum federal standards:

[T]he real engineering community had to go brain dead. They knew their families were going to drive the cars they were designing.... [T]hey are human beings, they put their pants on one leg at a timeyet they knew they couldn't go to the degree of the perfection that the engineering community would want them to go to. They had to go to the extent that the legal staff would let them go. And that was very frustrating to me because, we know, we as engineers know how to build a good car, and if we weren't allowed to do that, it was without a sense of achievement that cars got put on the road.
[9] On cross-examination, Elwell said that he could recall only one accident from 1977 to 1982 where a 1978 design fuel tank "was involved in a post-collision fire initiated by a foreign object direct impact with the tank."
[10] GM's position concerning the Ivey Report in this trial was consistent with the position it has taken in other litigation. In a case in Missouri federal court, GM tried to exclude the Ivey Report, arguing in a hearing brief that:

At that time, Mr. Ivey was just above an entry level engineer at General Motors. He apparently prepared the document on his own initiative. No General Motors employee requested that he prepare the document, and he did not disseminate it to anyone at General Motors. General Motors has never adopted its contents or used it for any purpose.
Baker v. Gen. Motors Corp., 197 F.R.D. 376, 382 (D.Ct.Mo.1999).
[11] Moseley v. Gen. Motors Corp., No. 90-V-6276 (Ga. Fulton Cty., Ct.).
[12] The court used the same numbering of documents as in the Cameron case. Documents 33 and 233 were the subjects of litigation in Cameron. See Cameron, 158 F.R.D. at 590. The district court ordered production of document 33 and a redacted version of document 233. See id. However, the Fourth Circuit vacated that order, finding that document 33 was protected by the attorney-client privilege, and document 233 by the attorney-client and work product privileges. See In re Gen. Motors Corp., No. 94-2435, 1995 WL 940063, at *1.
[13] On February 5, 1998, the trial court ruled in part as follows:

Mr. Jackson, the corporation put the mantle of case management on you in this case, I didn't. They didn't send you here as an individual, as a private lawyer, they sent you here as the case manager ... I will tell you one thing, I want those documents, I ordered them ... I want them. I don't think General Motors is big enough to thumb its nose at the Court, for your supervisor to say to you I'm not going to give it to you ... when you brought all these other documents without hesitation .... I don't think they are big enough to obstruct justice or to conceal evidence .... They are big enough to come here and defend themselves and have a right of access to the courts like we all do, and they are doing that.
[14] Judge Franza was not alone among trial judges in his concern over GM's discovery conduct. The original trial judge in Cameron wrote that "[a] review of the thousands of documents in this case ... reveals a substantial likelihood that perhaps perjury and the systematic destruction of documents involving gross misconduct by General Motors' regional counsel occurred." In re Gen. Motors Corp., No. 94-1011, 1994 WL 914453, at *1 (4th Cir. Mar.23, 1994). That trial judge recused himself from that case and the Fourth Circuit later struck the language quoted above. A Georgia trial judge found that "in concealing material information from the Moseley and Cameron courts, GM endeavored to and did obstruct and impede the due administration of justice." Bampoe-Parry v. Gen. Motors Corp., No. 98V50138297J (Fulton County, Ga., Sept. 7, 1999).

In another post-collision fire case, a federal district court ordered GM's defenses stricken and entered the equivalent of a default on liability; the appellate court concluded that although GM's discovery violations warranted a sanction, the sanction imposed was excessive. See Baker v. Gen. Motors Corp., 86 F.3d 811 (8th Cir.1996). When the question of whether certain documents are privileged is separated from GM's discovery conduct, the consensus of appellate courts, including this one, is that GM's privilege and work product objections to the documents at issue are well taken. See Baker v. Gen. Motors Corp., 209 F.3d 1051 (8th Cir.2000); In re Gen. Motors Corp., 1994 WL 914453.
[15] The Alice-in-Wonderland quality of attorney Jackson's testimony is exemplified by an exchange related to document 210. Interrogatories propounded to GM asked if there were any other documents "that related or pertained to the Ivey memo." GM responded that there were no such documents and none "that we are aware of at this time." The McGees' attorney asked Jackson whether or not such a response was truthful. Jackson responded:

A: It is a truthful response.
Q: You don't think that interview with Ed Ivey pertains or relates to the Ivey memo?
A: It does not relate to the Ivey memo.
Q: What does it relate to, sir, have you ever seen it?
A: It relates to an interview with Mr. Ivey.
Q: Regarding the Ivey memo?
A: There is a reference to the Ivey memo.
[16] In overruling GM's objection, the court commented that the question and answer "has to do with the integrity of the corporation... the credibility of the corporation."
[17] Mutty took the witness stand from March 4 and stepped down on March 19, 1998; Barcelow began his testimony on March 23 and completed it on March 31; Ridenour took the stand on March 31 and finished on April 2.
[18] The plaintiffs referred to the "secret crash tests at other locations" in closing.
[19] On a related point, we note that the case was presented to the jury on alternative theories, so GM's emphasis on the "safer alternative design" deficiencies in the plaintiffs' case is misplaced, and in one sense, unpreserved. Nonetheless, in the light most favorable to the plaintiffs, the evidence demonstrated that GM could have designed essentially the same product with a different, safer configuration.